Michael **TAYLOR**, Petitioner

v.

Betty **MITCHELL**, Warden, Respondent

No. 1:01CV601.

United States District Court, N.D. Ohio, Western Division.

March 3, 2003.

Jennifer P. Hite, Pamela J. Prude–Smithers, Office of the Public Defender, State of Ohio, Columbus, OH, for Michael Taylor, Petitioner.

Carol A. Ellensohn, Heather L. Gosselin, Office of the Attorney General, State of Ohio, Columbus, OH, Michael L. Collyer,

Office of the Attorney General, State of Ohio, Cleveland, OH, for Margaret Bagley, Respondent.

## ORDER

CARR, District Judge.

This is a capital habeas corpus case arising from the petitioner's conviction of one count of aggravated murder with specifications. The petitioner has exhausted his state court remedies.

For the reasons that follow, I find that all but one of the petitioner's contentions is without merit. With regard to his contention that the evidence was insufficient to enable a rational trier of fact to find him guilty beyond a reasonable doubt of aggravated murder, I, however, agree. The petition for a writ of habeas corpus shall, accordingly, be granted.

### Introduction

#### A. Factual Background

The following summary of the evidence from the petitioner's trial is taken from the opinion of the Ohio Supreme Court affirming the petitioner's conviction on direct appeal. *State v. Taylor,* 78 Ohio St.3d 15, 15–17, 676 N.E.2d 82 (1997).

On November 24, 1992, defendant-appellant, Michael N. Taylor, shot and killed Marion "Donny" Alexander in a bar. Despite appellant's self-defense claims, the jury found prior calculation and design, convicted appellant of aggravated murder, and recommended the death penalty.

Between 10:00 and 11:00 p.m. on November 24, 1992, appellant, his girlfriend, Sandra Paul, and David Roseborough arrived at the Club Seville, a bar in Garfield Heights, Ohio. Shortly thereafter, Marion "Donny" Alexander came in. Alexander, a regular in the bar, greeted Darlene Youngblood and Debra Lymore, who both worked at the bar, as well as Denise Shephard, another regular. They all sat around the main bar, but Alexander later took a seat alone at the nearby piano bar. Alexander did not talk with Paul, whom he had formerly dated, nor to appellant, whom he had previously met.

According to Shephard, Alexander acted quietly, and did not complain to or argue with appellant that night. However, appellant, Paul, and Roseborough described Alexander as loud and boisterous. Appellant and Paul claimed Alexander stared at them when they were dancing that night soon after they arrived at the club. According to Roseborough, Alexander flashed a large roll of bills and said, "If a nig* * * ain't getting it like this, he ain't suppose[d] to be in here." Paul recalled Alexander saying, "Any nig* * * [who] did not have any money, wasn't shit." Appellant believed Alexander was trying to humiliate him.

Later, some twenty to thirty minutes after appellant, Paul, and Roseborough had arrived, Paul went to the jukebox to play music. Alexander asked her to play a song for him. Appellant, still seated at the main bar, objected to Alexander's request. Youngblood testified that appellant told Alexander, "Put your own goddamn dollar in the box. My woman is not playing you no music." Roseborough recalled appellant said, "Man, I give her the money so she could play the music that we want to hear. * * * If you want to hear some music, put your money in there like I did * * *."

According to Youngblood, Alexander replied, "It ain't no problem. I have got a dollar here. * * * I just asked her to play * * *." According to Lymore, Alexander replied, "What's the problem? I have been knowing her. I talk to her when you are not around." Appellant again told Alexander, "Put your own goddamn dollar in there." Alexander and appellant glared at each other for a "couple of seconds," but did not approach each other. Then Paul

walked back to where appellant was sitting.

According to appellant's friends, Alexander told appellant after the jukebox incident that "this is his bar, and he do[es] what * * * he wants to do, [and] says what * * * he wants," and if appellant had "a problem with anything, I'm saying you can see me today, tomorrow." Alexander also allegedly cursed appellant as a "punk, hip mother fucker." It was asserted by the defense that when Paul was leaving the bar, Alexander said, "Bitch, * * * [I told] you not to bring this mother fucker up here to my bar."

When Paul got back to her seat, appellant told her, "Get your goddamn coat. We're getting out of here." Paul asked, "Can I drink my drink first * * * [and] hear my music." Appellant told her he did not "have time for this 'Kid's shit,' Let's go." Paul put her coat on and left the bar. Roseborough and appellant started to follow her, but Roseborough changed direction and walked over behind Alexander to the jukebox. Appellant stopped a little past Alexander. Roseborough said to appellant, "Look out," and Alexander stood up and raised his hands. Alexander told appellant, "Don't start no shit and it won't be no shit."

Appellant replied, "What did you say, mother fucker," pulled out a semiautomatic 9 mm pistol, and shot Alexander several times. After being shot three times, Alexander fell face down and tried to crawl away. Then appellant walked closer to Alexander and fired three or four more shots into his back. He left the scene in a taxi, calling out, "Self-defense." Later he surrendered voluntarily to the Garfield Heights Police.

## B. Procedural Background

The single Count in the indictment charged aggravated murder, defined as a purposeful killing with prior calculation and design. The Count contained three death specifications: 1) the offender had a firearm on or about his person or under his control while committing the offense charged; 2) the offender was convicted on April 8, 1974, of the purposeful killing or purposeful attempt to kill another; and, 3) the offender had previously been convicted of or pleaded guilty to an aggravated felony, to wit, murder.

Trial lasted from April 20 through April 26, 1993. On April 27, 1993, the jury returned a verdict of guilty as to the sole count and also found that the three specifications under Count One had been proven beyond a reasonable doubt.

At the mitigation hearing the petitioner presented evidence that he suffers from paranoid personality disorder. The petitioner also presented evidence from his minister, family members and a co-worker. Petitioner made an unsworn statement explaining his involvement in the crime. On April 29, 1993, the jury returned with a recommendation that petitioner be sentenced to death. The court followed the jury's recommendation, making an independent finding that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Petitioner was sentenced to death on May 28, 1993.

The court of appeals affirmed the decision of the trial court. The Ohio Supreme Court affirmed the conviction and sentence. *State v. Taylor*, 78 Ohio St.3d 15, 676 N.E.2d 82 (1997). The United States Supreme Court denied the petitioner's petition for a writ of certiorari. *Taylor v. Ohio*, 522 U.S. 851, 118 S.Ct. 143, 139 L.Ed.2d 90 (1997).

On September 23, 1996, the petitioner filed a post-conviction relief petition in the trial court. That court found that many of petitioner's claims had been raised on direct appeal and that petitioner had received a fair trial and was prop-

erly convicted. The trial court dismissed the petitioner's post-conviction petition on February 2, 1998.

Petitioner appealed the denial of his post-conviction petition to the court of appeals, which affirmed the trial court's decision on November 19, 1999. On March 15, 2000, the Ohio Supreme Court declined to accept petitioner's appeal for review on the basis that the petitioner had presented no substantial constitutional question.

On January 19, 2001, the petitioner filed a second post-conviction relief petition. Finding that petitioner was not unavoidably delayed from discovering the facts asserted in the petition, the trial court dismissed the petition on August 24, 2001.

Petitioner appealed the denial of his second post-conviction petition. The court of appeals affirmed the trial court's decision on May 30, 2002. On October 2, 2002, the Ohio Supreme Court declined to accept petitioner's appeal for review on the basis that it did not involve any substantial constitutional question.

The petitioner's habeas corpus petition asserts nine claims for relief, which will be discussed in the order in which they appear in the petition.

## 1. Ineffective Assistance of Counsel

### a. Failure to Procure a Ballistics Expert

■ The petitioner first claims that counsel were ineffective for failing to obtain a ballistics expert during the guilt phase of trial. A ballistics expert, petitioner claims, would have been able to corroborate petitioner's self-defense testimony during trial by demonstrating that the wounds petitioner inflicted on Alexander were consistent with petitioner's account of the murder.

This claim is procedurally defaulted. Petitioner first raised this issue as his eighth claim in the amended successor post-conviction petition. Because this is-

sue involves evidence *dehors* or outside the record, it should have been raised in the first post-conviction relief petition. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). Petitioner's attempt to raise this issue in his amended successor post-conviction petition was denied on the procedural ground that he could not meet any of the requirements enabling him to comply with Ohio's second or successive post-conviction petition statute, O.R.C. § 2953.23. Thus, that court did not address the merits of this claim.

■ Petitioner alleges he may overcome the procedural default hurdle by asserting that it would be a miscarriage of justice to invoke a procedural bar. Specifically, petitioner alleges he is actually innocent and that this fact should permit an adjudication on the merits of this claim.

In *Schlup v. Delo*, 513 U.S. 298, 314–15, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the United States Supreme Court determined that the petitioner in that case should have been afforded review of the merits of his claims after evidence suggested that he had been the victim of mistaken identity in the murder of a prison inmate. The Court discussed the standard to be applied when a habeas petitioner asserts actual innocence. The *Schlup* Court held that, where a petitioner seeks to use claims of actual innocence as a gateway to assert he was wrongly convicted of a crime, rather than objecting to the death sentence, the petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327, 115 S.Ct. 851 (quoting *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). To constitute the necessary "probability," the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.*

In *Schlup* the Court described the specific analysis a district court must employ when faced with a petitioner's allegation of actual innocence:

It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Id.* at 329, 115 S.Ct. 851.

During his post-conviction proceedings, petitioner obtained the services of Wayne Hill, a forensic consultant specializing in shooting reconstruction, to buttress his self-defense claim. The petitioner asserts that Hill's affidavit, Doc. 78, at p. 274, supplies the "new" evidence that the *Schlup* Court requires to assert an actual innocence claim. Far from demonstrating that no juror, acting reasonably, would have convicted petitioner in light of this affidavit, the Hill affidavit merely undercuts the state's theory of how the murder occurred. More importantly, as is described below, defense counsel elicited many of the findings to which Hill avers during cross-examination of the coroner. Thus, the evidence is not particularly "new" to petitioner's case. Because the Hill affidavit fails to meet the actual innocence standard articulated in *Schlup*, petitioner cannot use it to overcome the procedural bar to this claim.

This claim is without merit in any event. Petitioner asserts that counsel were ineffective for failing to request and secure a ballistic expert during trial. To prevail on a claim of ineffective assistance of counsel, petitioner must show both that his coun-

sel's performance "fell below an objective standard of reasonableness" and that he was prejudiced as a result. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel are presumed to have been competent, and the petitioner has the burden of overcoming this presumption. *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *United States v. Fortson,* 194 F.3d 730, 736 (6th Cir.1999). In applying *Strickland,* "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689, 104 S.Ct. 2052.

During defense counsel's cross-examination of the coroner, Robert Challener, counsel evoked much of the information that petitioner now asserts would have aided him. For example, petitioner alleged during trial that after firing his weapon, Alexander dove around a pillar, leading petitioner to cease firing as he no longer perceived himself in imminent danger. Tr. 765. In his affidavit, Hill supports this theory, noting that one of the wounds, wound 7, is consistent with a circumstance in which the victim is leaping or diving. Doc. 78, at 279. Defense counsel elicited this testimony during cross-examination of the coroner:

Counsel: You testified that your examination leads you to believe that the nature of that wound would be consistent with a situation where the deceased would be lying on the floor, if someone had fired at him; is that correct?

Coroner: That's correct.

Counsel: Would it also be consistent with a situation where the deceased might be diving over a table, [if] someone were firing at him?

Coroner: He could be diving over a table, but the barrel of the gun still has to be in back so [that] the trajectory of

the bullet is from back to front and upward, irrespective of how the body is placed, the bullet goes from back to front and upward very sharply.

\* \* \* \* \* \*

Counsel: So, in other words, what you are saying is that, while you indicated to the prosecutor that this particular wound is consistent with a particular situation, it is also consistent with several other situations, isn't it?

Coroner: An infinite number.

Tr. 429–30.

Moreover, Hill avers that if petitioner had fired at Alexander while he was lying prone, as the state suggested during trial, then the bullets from wounds 1 and 2 should have either been embedded in the floor underneath Alexander, or "left a clearly visible gouge/scrape in the floor's surface." Doc. 78, at 279. During closing argument of the guilt phase, defense counsel raised this issue, stating:

[W]hile you are deliberating,..., ladies and gentlemen, note very carefully that almost all the wounds involved here are what are referred to as through and through wounds. That meant that the bullet, the pellet went all the way through the body of the victim, all right, and if the defendant was standing over the victim and fired into him, I would ask you this: Where are those pellets, okay?

Now, you know, it is incumbent upon the State of Ohio to either produce those pellets, or to explain satisfactorily to you as to why they have not been produced, and I asked the question of the first officer on the scene, "What did you do?"

"Well, we brought in this half-million candle power light, and we flashed it all over the floor looking for evidence."

"You didn't find a single hole in the floor; and didn't find a single pellet on the floor," and the Coroner's testimony clearly indicates there should have been

any number of those pellets on the floor, directly under the place where the [victim] was shot, and, yet, the State of Ohio fails to produce a satisfactory explanation as to why they weren't there.

Tr. 833–34.

■ These excerpts from the record show that counsel raised the core issues delineated in the Hill affidavit. Defense counsel is not objectively unreasonable under *Strickland* for failing to obtain an expert when "trial counsel reasonably chose to rely upon cross-examination of the State's own witnesses to establish [petitioner's] case." *Smith v. Angelone*, 111 F.3d 1126, 1131 (4th Cir.1997). Additionally, although closing argument is not evidence, defense counsel undermined the state's theory that petitioner shot Alexander after he was lying on the ground by noting that the police investigation of the bar floor should have yielded those bullets. In light of these actions, it was not unreasonable for defense counsel not to request a ballistics expert.

### b. Failure to Object to Inclusion of Aggravating Factor in Indictment

■ Petitioner claims that counsel were ineffective for failing to object to the aggravated felony specification in his indictment. This claim is procedurally defaulted because petitioner did not raise it as a discreet claim to the Ohio Supreme Court. To exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir.1998). As stated above, petitioner cannot use the miscarriage of justice exception to procedural default by asserting his actual innocence.

Even if this claim were properly raised and addressed in state court, it would lack merit. As described below in grounds for

relief 2(c) (aggravated felony instruction) and 6(b) (absence during guilt phase deliberation questions), error occurring as a result of the aggravated felony specification in the indictment was harmless.

Because "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052, it is possible to disregard claims based on the fact that they did not prejudice the petitioner. Because this claim was asserted separately in this Opinion and found to be without merit, counsel's failure to object to the aggravated felony specification in the indictment is not prejudicial as it does not undermine the confidence in the outcome of the proceeding.

### c. Failure to Raise Petitioner's State of Mind During Guilt Phase

Defense counsel did not introduce the testimony of court-appointed psychologist, Dr. Rita Politzer, until the mitigation phase of trial. Petitioner contends that introduction of Dr. Politzer's testimony during the guilt phase to demonstrate his state of mind during the commission of the murder would have led to acquittal.

As an initial matter, respondent correctly notes that this claim was not raised in the petition and, instead, was raised for the first time in the traverse. Traverse at 19. Such action is disfavored. While the Sixth Circuit has yet to address the issue of whether a habeas petitioner may raise new claims in the traverse, other courts have determined a traverse is

not the proper pleading to raise new issues because it does not adequately notify the state of the claim or permit the state an opportunity to oppose it. *Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir. 1994); *see also Jack v. Randall,* No. C–2–99–947, 2000 WL 1456992, at * 7 (S.D.Ohio June 20, 2000) (prohibiting habeas petitioner from asserting new claim in traverse to which respondent had no opportunity to respond). Because, in this case, respondent was afforded the opportunity to respond to this claim in the sur-reply, however, it is not inherently prejudicial to respondent for this court to review this claim.

The petitioner raised this claim to the Ohio Court of Appeals and the Ohio Supreme Court on direct appeal. Both courts rejected the claim pursuant to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[1] The Ohio Supreme Court found the claim to be without merit, stating:

> Counsel reasonably chose not to offer evidence of appellant's paranoid personality disorder at the guilt phase in view of the doubtful value and admissibility of such evidence at that stage. *See State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 906; *State v. Wilcox* (1982), 70 Ohio St.2d 182, 24 O.O.3d 284, 436 N.E.2d 523 (psychiatric testimony unrelated to insanity is inadmissible to show defendant's incapacity to form intent). Moreover, appellant has not demonstrated that these tactical choices caused him prejudice, *i.e.,* that "were it not for counsel's errors, the result of the trial would

---

1. In the traverse, petitioner alleges that, while the Ohio Supreme Court cited to *Strickland* when analyzing his ineffective assistance of counsel claim, "there is no evidence that the Supreme Court actually applied the *Strickland* standard when reviewing Petitioner Taylor's ineffective assistance of counsel issue." Traverse at 40. A review of the Ohio Su-

preme Court's opinion, however, reveals that this argument is without merit. Although the Ohio Supreme Court did not specifically cite to *Strickland* at each juncture of its analysis, it clearly applied the two-pronged *Strickland* test in its review of petitioner's ineffective assistance claim.

have been different." *State v. Bradley,* at paragraph three of the syllabus.

*Taylor,* 78 Ohio St.3d at 31, 676 N.E.2d 82.

The opinion of the Court of Appeals, in large part adopted by the Ohio Supreme Court, additionally noted that "[e]xcept for a narrow exception in cases involving the battered woman syndrome, expert testimony regarding a defendant's state of mind is inadmissible to prove self-defense." *State v. Taylor,* No. 65711, 1995 WL 663267, at *18 (Ohio App. Nov. 9, 1995).

Because counsel likely would not have succeeded if they had attempted to introduce Dr. Politzer's testimony during the guilt phase of trial, the Ohio Supreme Court concluded that petitioner could not establish a *Strickland* violation. This conclusion was not an unreasonable one.

### d. Failure to Request Bifurcation of Capital Specification

■ During trial, counsel chose against bifurcating the capital specification, instead determining that the jury could hear evidence of this specification. The petitioner now asserts that this choice was tantamount to prejudicial error.

On appeal, the Ohio Supreme Court found no such error, concluding that "[c]ounsel ... reasonably chose against bifurcation on the death-penalty specification." 78 Ohio St.3d at 31, 676 N.E.2d 82. It reasoned that because petitioner "claimed self-defense and testified, his prior murder conviction would have been admissible as to his credibility regardless of bifurcation." *Id.*

Petitioner's claim represents the type of hindsight review of counsel's trial strategy that *Strickland* specifically rejects. The Ohio Supreme Court's decision finding the claim meritless is not an unreasonable application of *Strickland.*

### e. Failure to Object to Prosecutorial Misconduct

■ The petitioner alleges trial counsel's ineffective assistance because of counsel's failure to object to the prosecutorial misconduct petitioner asserts in his third claim. As petitioner noted in the traverse, respondent did not allege that this claim is procedurally defaulted. In the sur-reply, respondent counters that allegations of procedural default are contained in her third claim. Sur-reply at 3. The third claim, alleging prosecutorial misconduct, is distinct from an ineffective assistance of counsel claim for failure to object to it. Thus, respondent has not alleged procedural default for this claim. "[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter." *Trest v. Cain,* 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997) (internal quotation marks and citations omitted). Thus, a habeas court may forego a procedural default analysis and address the merits of a claim when the respondent fails to raise this defense. *See, e.g., Jamison v. Collins,* 100 F.Supp.2d 521, 597 (S.D.Ohio 1998) (addressing merits of claim when respondent failed to raise procedural default defense in return of writ or supplemental return of writ).

■ The Sixth Circuit has determined that while a habeas court is not required to undertake a *sua sponte* procedural default analysis. *Elzy v. United States,* 205 F.3d 882, 886 (6th Cir.2000). In any event, a court may do so because procedural default is not a jurisdictional bar to reviewing a habeas claim.

A review of petitioner's brief to the Ohio Supreme Court reveals that his ineffective assistance of counsel claim did not rest on a theory of ineffective assistance for failure

to object to prosecutorial misconduct. This claim is procedurally defaulted.

Petitioner's allegation of ineffective assistance for failure to object to prosecutorial misconduct also must fail on the merits. As analyzed below, petitioner's underlying prosecutorial misconduct claims lack merit. Because "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052, it is possible to disregard claims based on the fact that they did not prejudice the petitioner. Because the petitioner's prosecutorial misconduct claims are without merit, counsel's failure to object to any alleged, but nonexistent, prosecutorial misconduct was not prejudicial.

### f. Failure to Object to Jury Instructions

■ Petitioner claims that trial counsel were ineffective for failing to object to seven jury instructions: 1) the "acquittal first" instruction during the guilt phase; 2) the "acquittal first" instruction during the mitigation phase; 3) the murder is an aggravated felony instruction; 4) the specific intent instruction; 5) the reasonable doubt instruction; 6) referring to an aggravating circumstance as "repeat murder"; and, 7) the voluntary manslaughter instruction.

Respondent alleges that petitioner procedurally defaulted this claim for failing to raise these issues as discreet ineffective assistance of counsel claims to the Ohio Supreme Court. Petitioner counters that, in fact, he did raise these issues in his Ohio Supreme Court brief on direct appeal. Both assertions are correct. Although petitioner, in fact, did raise this claim to the Ohio Supreme Court, that court found the claims barred, with the sole exception of sub-claim five (5), because petitioner failed to raise these issues to the Ohio Court of Appeals. 78 Ohio St.3d at 31, 676 N.E.2d

82. Thus, the Ohio Supreme Court conducted a plain error review of these claims.

■ State court review of an otherwise procedurally defaulted claim to determine whether the error, if any, constituted a manifest miscarriage of justice does not revive the defaulted claim for purposes of federal habeas corpus review. *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir.1989); *see also Scott v. Mitchell*, 209 F.3d 854, 868 (6th Cir.2000) ("manifest injustice" review by Ohio Supreme Court of defaulted claim does not constitute waiver of the default). These claims are procedurally defaulted.

Were they not defaulted, they would not be meritorious in any event. Of the seven sub-claims, petitioner raised four (sub-claims (2), (3), (5), and (7)) in claim two as distinct improper jury instruction claims. Because the discreet jury instruction claims, as discussed below, are without merit, petitioner could not have suffered prejudice from counsel's failure to have objected to them. Accordingly the above sub-claims are without merit.

■ In sub-claim (1), petitioner alleges that counsel were ineffective for failing to object to the trial court's "acquittal first" instruction during the guilt phase of trial. A review of the trial court's guilt-phase instructions reveals that the trial court adequately instructed the jury regarding their deliberation process:

> If all of you are unable to agree on a verdict of either guilty or not guilty of aggravated murder, then you will continue your deliberations to decide whether the State has proved, beyond a reasonable doubt, all the essential elements of the lesser included offense of murder.

Tr. 868. The trial court provided similar instructions in the event that the jury found the defendant not guilty of, or could not agree on, the murder or voluntary manslaughter charges.

This instruction is not an "acquittal first" instruction because, while it charged the jury that it should deliberate on a lesser offense if it found petitioner not guilty of the greater, it also informed the jury that if they were unable to reach an agreement on an offense, the petitioner could not be found guilty of it.

Because the underlying jury instruction was not improper, the petitioner's claim that counsel were ineffective for failing to object to it lacks merit.

In his fourth sub-claim, petitioner asserts that "[t]he trial court diluted its instruction on specific intent by stating that 'Specific intent is no more or less than a particular intent proscribed by statute.'" Petition at 8. Without further elaboration on how this instruction was prejudicial, petitioner cannot demonstrate why counsel were objectively unreasonable for failing to object to it.

Finally, petitioner contends that counsel were constitutionally ineffective for failing to object when the trial court referred to the aggravating circumstance as "repeat murder." During the mitigation phase deliberations, the trial court charged: "Aggravated murder, in and of itself, is not an aggravating circumstance. The aggravating circumstance is as follows: Specification two: 'Repeat murder.'" Tr. 968.

This claim is procedurally defaulted because counsel failed to object to it during trial. *State v. Williams*, 51 Ohio St.2d 112, 364 N.E.2d 1364 (1977).

Although noting that trial counsel failed to object to this portion of the instructions, the Ohio Supreme Court found no trial court error in so referring to the aggravating circumstance, stating:

> [T]he trial court's use of that short, convenient term to refer to the aggravating circumstance was not improper nor did it inject a nonstatutory aggravating circumstance into the trial. The indictment as well as the trial court used the term "repeat murder" to refer to the specification, and appellant did not object. It is not unusual to use the term "repeat murder" in this context.

*Taylor*, 78 Ohio St.3d at 30, 676 N.E.2d 82 (citations omitted).

The Ohio Supreme Court's reasoning is sound. The trial court used the term "repeat murder" merely to simplify for the jury the aggravating circumstance introduced during trial. The use of this term was not prejudicial to the petitioner.

### g. Ineffective Assistance During Mitigation

Petitioner alleges that counsel were ineffective in three principal areas during the mitigation proceedings. First, the petitioner claims that counsel failed to investigate and introduce evidence of petitioner's background during the mitigation phase. Petitioner also alleges counsel's ineffectiveness for failing to obtain the experts necessary to procure and explain petitioner's social history and psychological deficiencies. Finally, petitioner claims that trial counsel did not adequately prepare the witnesses who did testify, choosing them only moments before placing them on the witness stand.

Respondent alleges that these claims are procedurally defaulted. Although petitioner raised these claims as his first, second, and third causes of action in the first postconviction petition, the court of appeals determined that the trial court had properly dismissed these claims because petitioner failed to attach the necessary documents to obtain an evidentiary hearing. It stated:

> When the claim of ineffective assistance of trial counsel is raised in a petition for postconviction relief, the petitioner bears the burden of submitting evidentiary materials which demonstrate

the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness. *State v. Jackson* (1980), 64 Ohio St.2d 107, 413 N.E.2d 819, syllabus. Absent such a showing, no evidentiary hearing is necessary. *State v. Pankey* (1981), 68 Ohio St.2d 58, 59, 428 N.E.2d 413.

In this instance, no evidentiary materials were submitted to demonstrate that errors occurred or that prejudice resulted. The trial court therefore did not err in denying these claims without holding a hearing. These assignments of error are therefore without merit. *State v. Taylor*, No. 75352, 1999 WL 1044602, **3–4 (Ohio Ct.App. Nov. 18, 1999).

Because of petitioner's failure, this claim is procedurally defaulted. *See Lorraine v. Coyle*, 291 F.3d 416, 426–27 (6th Cir.2002) (holding state rule barring review of postconviction petitioner's claims where petitioner failed to provide supporting documentation is adequate procedural ground on which to bar federal habeas review).

██ Petitioner acknowledges the default but alleges that he may overcome the procedural hurdle. First, petitioner contends that the circumstances present here warrant removal of the procedural default bar because this is an "exceptional case."

In *Lee v. Kemna*, 534 U.S. 362, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002), the United States Supreme Court held that, "there are ... exceptional cases in which exorbitant application of a generally sound [state-court] rule renders the state ground inadequate to stop consideration of a federal question." *Id.* at 376, 122 S.Ct. 877 (citing *Davis v. Wechsler*, 263 U.S. 22, 24, 44 S.Ct. 13, 68 L.Ed. 143 (1923)). There, the Court held that the petitioner's violation of a Missouri state rule requiring that continuance motions be written and accompanied by an affidavit would not bar federal habeas review. Noting that the Missouri procedural rule was both not the basis for the trial court denying the petitioner's motion and that the petitioner, in effect, had substantially complied with the rule's purpose, the Court held that petitioner's failure to comply with the letter of the rule would not bar a merit review in federal habeas court. *Id.* at 385, 122 S.Ct. 877. *See also Oabourne v. Ohio*, 495 U.S. 103, 110, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) ("[A]lthough we do not doubt the general applicability of the Ohio Rule of Criminal Procedure requiring contemporaneous objection to jury charges, we nevertheless conclude[ ] that, in this atypical instance, the Rule would serve no perceivable interest.") (internal quotation marks and citations omitted).

This case presents no exceptional circumstances that overcome the procedural bar. Unlike the petitioner in *Kemna,* Taylor did not substantially comply with the Ohio rule requiring supporting documentation to prove his ineffective assistance of counsel claim. More importantly, the *Kemna* Court noted that, unlike here, the state court did not invoke the state procedural rule in denying petitioner's motion for a continuance. Because a "State remains free to impose proper procedural bars to restrict repeated returns to state court for postconviction proceedings," *Slack v. McDaniel,* 529 U.S. 473, 489, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), this argument must fail.

Petitioner next contends he can demonstrate cause and prejudice to excuse the default. He asserts that because the Ohio post-conviction statutes create a due process property interest in his right to counsel during post-conviction proceedings, he has a concomitant right to constitutionally effective assistance of counsel during his collateral attack. While petitioner acknowledges that he has no constitutional right to post-conviction counsel, he asserts

that, pursuant to *Evitts v. Lucey,* 469 U.S. 387, 401, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." Consequently, petitioner asserts, post-conviction counsel's failure to attach documents in support of his ineffective assistance claims unconstitutionally divested him of this property interest.

■ The United States Supreme Court disagrees. In *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), the Court held that a post-conviction petitioner has no right to counsel. Noting that the source of the right to post-conviction counsel was created pursuant to Pennsylvania statute, the Court reasoned that it is the source of the right to counsel, combined with the type of proceeding, that implicates a constitutional right to counsel, and, thus, whether there can be a due process violation. Explicitly rejecting the argument the petitioner makes here, the *Finley* Court held *Evitts* inapplicable to state habeas proceedings because "the substantive holding of *Evitts*—that the State may not cut off a right to appeal because of a lawyer's ineffectiveness—depends on a constitutional right that does not exist in state habeas proceedings." *Id.* at 558, 107 S.Ct. 1990. Accordingly petitioner cannot demonstrate cause and prejudice to overcome his procedural default.

■ Petitioner next alleges that he can show that he is entitled to a merits review of his claims pursuant to the miscarriage of justice exception to the procedural default rule. Specifically, petitioner alleges he is actually innocent of the death penalty and that this fact should permit an adjudication on the merits of his claims. As stated above, in *Schlup v. Delo,* 513 U.S. 298, 314–15, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the United States Supreme Court determined that the petitioner in that case should have been afforded a merit review of his claims after evidence suggested that he had been the victim of mistaken identity in the murder of a prison inmate.

The *Schlup* Court reaffirmed an earlier finding that, where a petitioner claims he is actually innocent of the death penalty, as opposed to the underlying crime, a more rigorous standard applies: a petitioner "must show by clear and convincing evidence that but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." 513 U.S. at 323, 115 S.Ct. 851 (citing *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)) (internal quotation marks and further citations omitted).

Petitioner asserts that the evidence he presented during his post-conviction proceedings—that he suffers from post-traumatic stress disorder (hereinafter "PTSD") and organic brain damage presents significant new evidence that meets this standard. While this evidence is noteworthy and might possibly persuade some jurors not to impose a death sentence, it does not show clearly and convincingly that no reasonable juror would have found the petitioner eligible for the death penalty. Accordingly petitioner cannot overcome the procedural default of these claims based on assertions of actual innocence.

Finally, petitioner implores the Court to review counsel's overall performance even if it finds these claims procedurally defaulted. Granting this request, and reviewing the petitioner's claims on the merits, despite his default, I find no basis for relief.

**i. Failure to Investigate/Introduce Mitigating Evidence**

When examining a claim of ineffective assistance for failure to investigate a petitioner's background and introduce mitigating evidence, "it is best to begin with the evidence Petitioner actually presented in mitigation." *Lorraine v. Coyle,* 291 F.3d 416, 427 (6th Cir.2002). During the mitigation phase of trial, defense counsel presented one clinical psychologist, four lay witnesses, and petitioner's unsworn statement.

Initially, Dr. Rita J. Politzer, testified that petitioner suffers from paranoid personality disorder. This disorder, Dr. Politzer stated, would cause an individual to be overly suspicious, perceiving social situations as threatening, contrary to those not suffering from the affliction. Tr. 907–08. She next stated that, although individuals who suffer from paranoid personality disorder tend to become violent, this disorder generally is amenable to treatment. *Id.* at 908–09. Dr. Politzer stated that petitioner likely would respond well to treatment for his disorder and adjust well to prison life. *Id.* at 910.

Counsel next called the four lay witnesses: Suette Bell Steiner, who testified about petitioner's excellent work record; Robert L. Doss, petitioner's minister; Constance Turner, the mother of petitioner's child, and Sharon Levett, petitioner's sister, who testified about petitioner's childhood and character. The petitioner then provided the jury with a brief, unsworn statement. The state presented no rebuttal witnesses.

In the past several years, the Sixth Circuit has issued a number of opinions on this issue. In one of the first such cases, *Glenn v. Tate,* 71 F.3d 1204 (6th Cir.1995), the court found trial counsel were ineffective for failing to investigate and present mitigating evidence of petitioner's brain damage. Counsel in *Glenn* utterly failed to prepare for the mitigation phase of trial prior to completion of the guilt phase.

Once the jury convicted petitioner, counsel prepared a videotape, later ruled inadmissible by the trial court, of petitioner's neighborhood. *Id.* at 1207. Although counsel did present testimony from, among others, a teacher who had known the petitioner during his childhood and a minister who did not know petitioner but who, rather unsuccessfully, argued against the morality of the death penalty, counsel failed to introduce an array of evidence that would have demonstrated the petitioner's mental inabilities, including I.Q. tests that placed him within the mentally defective range. *Id.* at 1208. The court concluded that, "[t]he failure of John Glenn's counsel to draw the jury's attention to the organic brain problem here, and to the possibility that it helped turn John Glenn into putty in the hands of his admired older brother [who planned the underlying crime], was both objectively unreasonable and prejudicial." *Id.* at 1211.

In the wake of *Glenn,* the Sixth Circuit held on several other occasions that counsel's failure to investigate and present mitigating evidence warranted granting habeas corpus relief. For example, in *Carter v. Bell,* 218 F.3d 581 (6th Cir.2000), the court held that counsel's representation was constitutionally ineffective because of counsel's use of a residual doubt theory during mitigation when counsel neither investigated nor presented evidence of the petitioner's extreme poverty-ridden childhood and mental condition despite counsel's awareness of those circumstances.

Finding that counsel cannot rely on the petitioner as the sole source of information when investigating for mitigating evidence, the Sixth Circuit held that "counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to [its] utility." *Id.* at 596. Several other cases have followed this reasoning. *See Coleman v. Mitchell,*

268 F.3d 417, 449–53 (6th Cir.2001) (finding counsel acted unreasonably for failing to present evidence of petitioner's horrific childhood, which included physical and psychological abuse); *Skaggs v. Parker,* 235 F.3d 261, 266–75 (6th Cir.2000) (holding counsel ineffective for failing to investigate and present mitigating evidence); *Groseclose v. Bell,* 130 F.3d 1161, 1169–71 (6th Cir.1997) (finding counsel's failure to develop "any defense theory whatsoever" and failure to present mitigating evidence was constitutionally ineffective); *Austin v. Bell,* 126 F.3d 843, 849 (6th Cir.1997) (same).

In several more recent decisions, however, the Sixth Circuit seemingly has limited its previous holdings, stating that "the cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct [a mitigation] investigation." *Campbell v. Coyle,* 260 F.3d 531, 552 (6th Cir. 2001). The court distinguished cases in which counsel failed to investigate altogether from those which "do[ ] not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation," noting that in the latter, the *Strickland* presumption of counsel's reasonableness will be hard to overcome. *Id. See also Lorraine v. Coyle,* 291 F.3d 416 (6th Cir.2002) (reversing district court and holding no ineffective assistance of counsel for failing to present mitigation evidence, particularly in light of habeas counsel's inability to demonstrate prejudice); *Martin v. Mitchell,* 280 F.3d 594 (6th Cir.2002) (finding counsel not constitutionally ineffective for failing to present mitigating evidence when counsel did present some, albeit non-exhaustive, evidence in mitigation and petitioner failed to demonstrate prejudice); *Williams v. Coyle,* 260 F.3d 684 (6th Cir. 2001) (same).

The petitioner alleges that, had counsel performed effectively, counsel would have discovered and could have presented the following evidence during trial: 1) petitioner suffers from seizures; 2) petitioner suffers from severe headaches; 3) petitioner served in the United States Army during the Vietnam conflict from 1966–69, experiencing heavy combat and being exposed to Agent Orange; 4) petitioner's son suffers from seizures; 5) petitioner began carrying a firearm and suffering from sleep disorders and nightmares after his service in Vietnam; 6) petitioner was traumatized by his mother's death; 7) petitioner is a loving parent; and 8) petitioner has a defective heart valve. Moreover, petitioner alleges that evidence that he suffers from PTSD and organic brain damage would have convinced the jury to refrain from imposing a death sentence.

While some of the evidence petitioner proffers is potentially significant, counsel's actions in this case were not objectively unreasonable. Rather than demonstrating a complete "abdication of advocacy," *Austin,* 126 F.3d at 849, counsel's actions in this case are akin to those of counsel in *Campbell* and *Martin.* Counsel sought and received a psychiatric evaluation of petitioner, presenting the results during mitigation. Moreover, counsel presented evidence of petitioner's work ethic and his character. Thus, it appears, trial counsel's mitigation strategy met *Strickland* standards. Although petitioner, in hindsight, expresses his "dissatisfaction with the degree of his attorneys['] investigation," *Campbell,* 260 F.3d at 552, *Strickland* discourages such a retrospective review of counsel's behavior. While it may have benefitted petitioner if counsel had presented at least some of the above-listed evidence, the investigation and concomitant mitigation evidence counsel presented during trial were adequate.

Finally, as respondent notes, some of the evidence petitioner now asserts would have aided him in mitigation was not particularly favorable to him. Specifically, introducing petitioner's Vietnam service records may not have benefitted him. While in the service, petitioner was AWOL and threatened an officer, the latter offense leading to his discharge from service "for the good of the service under other than honorable conditions." Affidavit of Dr. Michael Gelbort, Doc. 77, at 57. Counsel are not required to present testimony when it would elicit unfavorable facts during the prosecutor's cross-examination. *Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir.2000).

### ii. Failure to Procure Mitigation and Mental Health Experts

Petitioner next takes issue with counsel's failure to procure a mitigation specialist and to obtain a psychologist specializing in PTSD. Additionally, petitioner charges that, had counsel conducted an adequate investigation, counsel would have requested a neurologist to examine petitioner for organic brain damage.

Petitioner fails to demonstrate that counsel's actions were objectively unreasonable. This case is factually similar to *Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001). In that case, defense counsel presented psychological evidence during the mitigation phase of trial that the petitioner suffered from polysubstance abuse and had an antisocial personality disorder. *Id.* at 537–38. During state post-conviction proceedings, the petitioner in *Campbell* presented evidence that his client may have suffered from PTSD as a result of being burned in a fire at age five. *Id.* at 546. Campbell's trial counsel did not present any evidence of PTSD to the jury at either phase of trial. Despite hiring a mitigation specialist and clinical psychologist, counsel remained unaware that petitioner might suffer from this condition. *Id.*

The court distinguished *Campbell* factually from *Seidel v. Merkle*, 146 F.3d 750 (9th Cir.1998). In *Seidel* the Ninth Circuit determined that trial counsel had been constitutionally ineffective for failing to investigate the petitioner's PTSD even though the pre-trial record was replete with references to petitioner's hospitalization in mental institutions and ingestion of psychiatric medication. *Id.* at 755. After an evidentiary hearing revealed that trial counsel failed to conduct "any" investigation into petitioner's mental health, the court found counsel constitutionally ineffective. *Id.*

While noting that the finding in *Seidel* of ineffective assistance was sound under the facts of that case, the Sixth Circuit also found that "an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken." *Id.* (citing *White v. McAninch*, 235 F.3d 988, 995 (6th Cir.2000)).

The court then determined that it was not objectively unreasonable for counsel in *Campbell* to rely on the psychologist they obtained during trial:

Even though Dr. Chiappone as a trained psychologist failed to detect any evidence of PTSD, [petitioner] asks us to declare that his counsel's independent failure to make the same diagnosis is an objectively unreasonable mistake, depriving him of his Sixth Amendment right to the effective assistance of counsel. There is no evidence that Dr. Chiappone was incompetent, or that [petitioner's] lawyers had any reason to question Chiappone's professional qualifications.

We conclude, therefore, that it was objectively reasonable for [petitioner's] trial counsel to rely upon Dr. Chiap-

pone's diagnosis and, further, trial counsel's failure to independently diagnose PTSD was not unreasonable.

*Id.* at 555.

[26] This holding is fatal to petitioner's claim. As with trial counsel in *Campbell*, petitioner's trial counsel reasonably relied on Dr. Politzer, a forensic psychologist, who diagnosed petitioner with a paranoid personality disorder, rather than PTSD. The sole fact that petitioner served in Vietnam neither imputes awareness that petitioner suffers from PTSD nor required counsel to investigate its possible existence. Counsel cannot be responsible for procuring a second expert simply because one expert reached a result that petitioner now asserts is inaccurate. *See Beans v. Black*, 757 F.2d 933, 936 (8th Cir.1985) (counsel's actions not objectively unreasonable for failing to procure second expert on petitioner's competence when first expert found petitioner competent to stand trial).

Similarly, it is unclear why counsel should have known, as petitioner asserts, to request a neurologist to examine him for organic brain damage. Although during the post-conviction proceedings Dr. Gelbort determined that petitioner may suffer from organic brain damage, Gelbort affidavit, Doc. 77, at 60, petitioner cannot demonstrate that counsel's reliance on Dr. Politzer's clinical impressions was objectively unreasonable. Because Dr. Politzer presumably did not find any evidence of organic brain damage, it was reasonable for counsel to end their psychological inquiry with her conclusions.[2]

■ Petitioner also cannot show ineffectiveness due to counsel's failure to obtain a mitigation specialist. During the trial, counsel moved the court for a mitigation expert. The trial court, providing no explanation, denied the motion as moot. Petition at 10. Petitioner fails to explain what further action counsel should have taken. Counsel's failure to procure a mitigation specialist was not objectively unreasonable.

### iii. Failure to Prepare Mitigation Witnesses

■ After trial, petitioner obtained the affidavits of ten family members and friends, some of whom testified during the mitigation phase, who averred that they had valuable mitigation information but were never contacted by trial counsel to testify or were not asked questions during trial to elicit this valuable information. Doc. 11, exhibits 4–14.

These affidavits counter what defense counsel stated during their federal habeas depositions, in which counsel stated that they talked with the witnesses who testified prior to trial, practicing questions and possible cross-examination scenarios with them. Doc. 50, at 18. Moreover, one of petitioner's trial counsel indicated that, prior to trial, he spoke with family members, even attending a prayer meeting with the family at one point. *Id.* at 34.

Counsel's behavior was not objectively unreasonable. As it appears that counsel had, at least, adequate contact with family members prior to and throughout the trial, petitioner does not allege a sustainable claim of ineffective assistance of counsel.

**2.** Dr. Politzer's trial testimony is the only record of her psychological evaluation. During her deposition in this habeas proceeding, Dr. Politzer noted that she did not bill the court for preparing a report in this case. Doc. 52, at 18. While Dr. Politzer did not have the case file in her possession during deposition, she informed habeas counsel that, in some instances, she does not prepare a report for trial at counsel's request if the report would not be a favorable one. *Id.* at 20. She did not specifically recall if that situation existed in this instance. *Id.*

## 2. Improper Jury Instructions

Petitioner asserts that the trial court charged the jury improperly regarding 1) voluntary manslaughter; 2) flight; 3) aggravating felony specification; 4) life sentence; and 5) reasonable doubt.

 An incorrect jury instruction does not warrant federal habeas corpus relief if it was merely undesirable, erroneous or universally condemned. Instead, the instruction must violate a constitutional right. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). On review, a court must determine whether there is a reasonable likelihood that the jury applied the instruction in a way that prevents consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The impropriety of the instruction must be considered in the context of the instructions as a whole and of the entire trial record. *Id.* "Errors in jury instructions do not rise to the level of a constitutional violation unless the habeas petitioner can establish that the 'instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Buell v. Mitchell*, 274 F.3d 337, 365 (6th Cir.2001).

### a. Voluntary Manslaughter Instruction

██ The trial court provided the following voluntary manslaughter instruction during trial:

If you are unable to agree on a verdict of either guilty or not guilty of murder, then you will continue your deliberations to decide whether **the State has proved**, beyond a reasonable doubt, all the essential elements of the lesser included offense of voluntary manslaughter.

Tr. 870. (emphasis supplied).

██ This instruction incorrectly allocated the burden of proof to the state. In Ohio, a jury may convict a defendant on the offense of manslaughter only if the defendant proves that the homicide occurred while under the influence of sudden passion or in a sudden fit of rage. O.R.C. § 2903.03. The trial court also instructed the jury that if the state fails to prove all the elements of aggravated murder or murder, then it must consider whether to convict the defendant of voluntary manslaughter. Tr. 870. This was a so-called "acquittal-first" instruction.

Petitioner has procedurally defaulted this sub-claim on two grounds. First, petitioner failed to object to this instruction during trial. As a result, the Court of Appeals ruled that this claim was procedurally defaulted. Accordingly that court declined to consider this claim on its merits, except to examine it for a manifest miscarriage of justice. *State v. Taylor*, No. 65711, 1995 WL 663267, at *9 (Ohio Ct.App. Nov. 9, 1995). The court found that although the trial court provided the jury with an incorrect voluntary manslaughter instruction, there was no plain error because there was overwhelming evidence of murder in petitioner's case. *Id.* (citing *State v. Cooperrider*, 4 Ohio St.3d 226, 448 N.E.2d 452 (1983)). As stated above, state court review of an otherwise procedurally defaulted claim to determine whether the error, if any, constituted a manifest miscarriage of justice does not revive the defaulted claim for purposes of federal habeas corpus review. *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir.1989); *see also Scott v. Mitchell*, 209 F.3d 854, 868 (6th Cir.2000) ("manifest injustice" review by Ohio Supreme Court of defaulted claim does not constitute waiver of the default).

██ Moreover, petitioner failed to raise this claim to the Ohio Supreme Court on direct appeal. Consequently he did not properly exhaust his claim. Exhaustion occurs only "when the highest court in the state in which the petitioner was convicted

has been given a full and fair opportunity to rule on the petitioner's claims." *Lott v. Coyle,* 261 F.3d 594, 608 (6th Cir.2001) (quoting *Manning v. Alexander,* 912 F.2d 878, 881 (6th Cir.1990)). If no further remedy exists in state court, however, then exhaustion is no longer at issue. Rather, the petitioner must demonstrate cause and prejudice for failing to present the claim to state court. *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir.1994).

■ Petitioner asserts that ineffective assistance of appellate counsel can serve as cause to excuse procedural default. United States Supreme Court precedent, however, teaches otherwise. That Court recently determined that a petitioner may only use an ineffective assistance of counsel claim to establish cause if that separate ineffective assistance of counsel claim is, in itself, not procedurally defaulted. *Edwards v. Carpenter,* 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). Thus, pursuant to *Carpenter,* a habeas petitioner must demonstrate either that the distinct ineffective assistance of counsel claim is not procedurally defaulted, or cause and prejudice to excuse the default for that claim. As discussed with regard to claim four, petitioner's ineffective assistance of appellate counsel claim is procedurally defaulted and petitioner cannot show adequate cause and prejudice to excuse the default. Accordingly petitioner may not use ineffective assistance of appellate counsel to excuse his failure to raise this claim to the Ohio Supreme Court.

■ Even if the claim could be considered on the merits, it would not be welltaken. With regard to the first aspect of this claim, the improper shifting of the burden of proof, the prosecution, as the court of appeals concluded, presented the jury with overwhelming evidence of mur-

der. Petitioner was carrying a weapon when he entered the bar and positioned his companion behind the victim before he confronted him. Thereafter, he shot the victim twice and continued to shoot even after the victim had fallen. The trial court's incorrect burden shifting instruction did not deny petitioner due process.[3]

■ With regard to the "acquittal first" contention, the trial court did not expressly require the jury to acquit petitioner of aggravated murder and murder before considering his guilt of voluntary manslaughter. The Ohio Supreme Court dealt with a similar instruction in *State v. Thomas,* 40 Ohio St.3d 213, 220, 533 N.E.2d 286 (1988). The Court stated that, although such instruction is not proper, the instruction did not have a coercive effect on the jury because the instruction dealt primarily with the jury's inability to find an element of a greater offense. Similarly, the instruction in this case did not fundamentally deny petitioner a fair trial. *See Jamison v. Collins,* 100 F.Supp.2d 647, 719 (S.D.Ohio 2000) (holding virtually identical instruction did not deny petitioner a fair trial).

#### b. Flight Instruction

■ Petitioner next contends that the trial court denied him due process by providing the jury with a flight instruction. Petitioner claims this instruction impermissibly required the jury to find that petitioner possessed prior calculation and design in killing Alexander based on his flight from the scene, alleviating the state from so proving. Although respondent alleges this claim is procedurally defaulted, the Ohio Supreme Court held on direct appeal that, because trial counsel objected to the instruction, it was properly pre-

---

3. This conclusion does not alter the conclusion, *infra,* that there is insufficient evidence for a rational jury to find prior calculation and design, which would elevate the crime from murder to aggravated murder.

served for appeal. *State v. Taylor*, 78 Ohio St.3d 15, 27, 676 N.E.2d 82 (Ohio 1997).

Because petitioner exited from the bar after shooting the victim, the prosecutor asked for and the trial court charged the jury on flight. The trial court instructed the jury as follows:

> Now, in this case, there is evidence tending to indicate that the defendant fled from the vicinity of the alleged crime. In this connection, you are instructed that flight, in and of itself, does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection to the crime.

(Tr. 862).

On appeal, the Ohio Supreme Court held the instruction was proper, noting that the trial court merely instructed that flight tended to show consciousness of guilt, rather than required such a finding. 78 Ohio St.3d at 27, 676 N.E.2d 82. Moreover, the court noted that because Taylor testified at trial, the trial court did not implicate his Fifth Amendment right not to testify with its "unless satisfactorily explained" language. *Id.* The petitioner cannot demonstrate that the Ohio Supreme Court unreasonably applied any United States Supreme Court precedent in its decision. Accordingly this instruction does not so infect the trial as to deny petitioner due process. *Drake v. Superintendent, Trumbull County Corr. Inst.*, 106 F.3d 400 (Table), 1997 WL 14422, at *7 (6th Cir. Jan.14, 1997).

#### c. Aggravated Felony Instruction

 After instructing the jury that they must determine whether Taylor previously was convicted of murder under the "repeat murder" specification, the trial court then told the jury it must once again find, pursuant to specification three in the indictment, whether Taylor previously was convicted of the murder. T. 875. Petitioner claims this repetition violated his due process right to a fair trial.

The Ohio Supreme Court analyzed this claim on direct appeal, concluding that although the duplicative instruction was improper pursuant to Ohio law,[4] it was harmless error because the inclusion of this instruction only disclosed to the jury information that it would have properly heard pursuant to the prior murder specification. *State v. Taylor*, 78 Ohio St.3d 15, 25, 676 N.E.2d 82 (Ohio 1997). Moreover, the court concluded, Taylor intentionally chose to have the death penalty specification tried to the jury because he planned to testify during trial and knew the prosecution would undoubtedly raise the issue during his cross examination. *Id.*

Although petitioner contends that the Ohio Supreme Court's holding is contrary to *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) and *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), those cases are inapposite. Both *Clemons* and *Stringer* dealt with the circumstance where a jury sentenced the defendant to death pursuant to two or more aggravating factors when one of those aggravating factors later was invalidated as unconstitutionally vague. These cases, therefore, are not authority for finding that the trial court's duplicative aggravated felony instruction violated the petitioner's constitutional rights.

---

4. Pursuant to Ohio law, a trial court may only charge the jury regarding the aggravated-felony specification when the defendant is indicted for an aggravated felony. Ohio Rev.Code § § 2929.11(B) (1), (B)(2)(b), (B)(3)(b), and (F). Neither murder nor aggravated murder is an aggravated felony in Ohio. Ohio Rev. Code § 2901.02(A).

#### d. Consideration of Life Sentence Instruction

 Petitioner claims that the trial court improperly charged the jury regarding its sentencing determination.

The challenged instruction stated:

If all 12 members of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstances which the defendant was found guilty of committing, outweighs the mitigating factors, then you must return such a finding to the Court.

I instruct you, as a matter of law, that, if you make such a finding, then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant, Michael Taylor.

On the other hand, if, after considering all of the relevant testimony, other evidence, the statement of the defendant, and the arguments of counsel, you find that the State of Ohio failed to prove, beyond a reasonable doubt, that the aggravating circumstance which the defendant was found guilty of committing, outweighs the mitigating factors, then you will return your verdict reflecting your decision.

In this event, you will then proceed to determine which of the two possible life imprisonment sentences to recommend to the Court.

Tr. 971–72.

On direct appeal, the Ohio Supreme Court noted that Taylor had not properly preserved this claim for appeal because he both failed to object to it during trial and did not raise it to the Court of Appeals. *State v. Taylor,* 78 Ohio St.3d at 28, 676 N.E.2d 82. The court then addressed the merits of the claim, concluding that the trial court's instruction was not plain error. *Id.* at 29, 676 N.E.2d 82.

Petitioner claims that because the Ohio Supreme Court addressed this claim on its merits, his procedural default should be excused. In *Scott v. Mitchell,* 209 F.3d 854, 866 (6th Cir.2000), the Sixth Circuit noted that an alternative holding in which the state court performs a plain error analysis does not constitute a waiver of the state procedural bar preventing a habeas court from reviewing the claim. Moreover, in *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir.2000), the court explicitly rejected petitioner's assertion stating, "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules." The petitioner next contends he can demonstrate cause and prejudice to excuse any default based on trial counsel's ineffectiveness for failing to object to this instruction. As stated in claim one, however, the discreet ineffective assistance of counsel claim is procedurally defaulted because petitioner failed to raise it to the Ohio Court of Appeals. The Ohio Supreme Court conducted a plain error review of that claim. Because petitioner cannot successfully assert cause and prejudice to excuse the default of his ineffective assistance of counsel for failure to object to the jury instruction claim, he may not use it as cause to excuse the procedural default of this claim. *Edwards v. Carpenter,* 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

This claim would be without merit in any event. This charge was modeled after Ohio Revised Code § 2929.03(D)(2), which reads in pertinent part:

If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with

parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

Ohio Rev.Code § 2929.03(D)(2).

The Sixth Circuit recently issued an opinion seemingly in conflict with earlier sentencing unanimity instruction decisions. In those earlier decisions, such as *Coe v. Bell,* 161 F.3d 320 (6th Cir.1998), the court found that a sentencing instruction setting forth the statutory weighing process did not run afoul of the United States Supreme Court precedent set by *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). In *Mills* and *McKoy,* the Court determined that sentencing instructions that require jurors to unanimously find and agree on specific mitigating factors before using those factors in the weighing process are unconstitutional. *Mills,* 486 U.S. at 384, 108 S.Ct. 1860.

The *Coe* Court distinguished the *Mills* and *McKoy* sentencing instructions, noting that, "[i]n Coe's case, by contrast, it is fairly clear that . . . the unanimity refers to the weighing process and not to the finding of a mitigating factor." *Coe,* 161 F.3d at 338. Thus, the *Coe* Court found nothing constitutionally unsound when a sentencing instruction articulated the weighing process involved in reaching a verdict but did not specify how to find the existence of specific mitigating factors. Similarly, in *Scott v. Mitchell,* 209 F.3d 854 (6th Cir.2000), the Court found that a sentencing instruction substantially identical to Taylor's passed constitutional muster.[5] Finding that Scott's sentencing instruction was indistinguishable from the instruction provided in the *Coe* case, the *Scott* Court determined, as in *Coe,* that a jury instruction which requires unanimity only as to the overall weighing of mitigating factors and aggravating circumstances was constitutionally sound. *Id.* at 875. Finally, in *Roe v. Baker,* 316 F.3d 557, 563 (6th Cir. 2002), a pre-Anti-Terrorism and Effective Death Penalty Act case, the Sixth Circuit found no constitutional violation when the sentencing court failed to instruct the jury that unanimity was not required to find for a life sentence. Citing *Scott, Coe,* and *Jones v. United States,* 527 U.S. 373, 381–84, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), the court held in *Roe* that no such instruction was constitutionally required. *Id.*

Very recently, however, a panel of the Sixth Circuit determined that a similar unanimity instruction *was* constitutionally infirm. *Davis v. Mitchell,* No. 00–4193, 318 F.3d 682, 2003 WL 222741 (6th Cir. Feb.4, 2003). There the Court found that the instruction both violated the *Mills* man-

---

5. The sentencing instruction in *Scott,* as quoted by that Court, reads:

If all 12 members of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstances which Jay Scott was found guilty of committing outweigh the mitigating factors, then you must return such a finding to the Court. I instruct you as a matter of law that if you make such a finding, then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant, Jay Scott. [ . . . ]

On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence, the statement of Jay Scott, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision.

In this event, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court. [ . . . ]

209 F.3d at 873.

date that jurors need not unanimously find specific mitigating factors, and that the charge improperly required the jury to first "acquit" the petitioner of the death penalty before choosing a life sentence. The charge at issue, virtually identical to those recited above, reads as follows:

> If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances which Wiley Davis, Jr. was found guilty of committing outweigh the mitigating factors, if any, then you must return such finding to the Court.

> I instruct you as a matter of law that if you make such a finding then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant, Wiley Davis, Jr.

> On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence, the unsworn statement of Wiley Davis, Jr. and the arguments of counsel, you find that the State of Ohio failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant, Wiley Davis, Jr., was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision; that is, you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors.

> In this event you will then proceed to determine which of the two possible life imprisonment sentences to recommend to the Court.

*Id.* at 684–85.

The court in *Davis* found three defects in this charge: 1) silence on the lack of unanimity; 2) the requirement that the jury first "acquit" the petitioner of the death penalty before it could consider a life sentence (a so-called "acquittal-first" instruction); and, 3) the portion of the charge in which the trial court stated that all twelve jurors must be in agreement. *Id.* at 690. These facets of the charge, the court held "would have led a reasonable jury to apply an unconstitutional standard of unanimity at all stages of the deliberative process." *Id.* The *Davis* court did not distinguish—indeed it failed to cite—*Coe, Scott,* and *Roe.*

Guidance to resolve the conflict between *Davis* and the court's earlier published decisions is found in the Sixth Circuit's rules of practice, which state: "Reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court en banc consideration is required to overrule a published opinion of the court." Sixth Cir. Internal Operation Proc. 206(c). Moreover, in *United States v. Smith,* 73 F.3d 1414 (6th Cir.1996) the Court held that "[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Id.* at 1418 (quoting *Salmi v. Sec'y of Health and Human Serv.,* 774 F.2d 685, 689 (6th Cir.1985)); *see also Roe v. Baker,* 316 F.3d 557, 570 (6th Cir. 2002) (Clay, J., concurring, writing separately to express continued objection to prior Sixth Circuit decision but noting its binding effect on present case). Accordingly, *Coe, Scott,* and *Roe* remain controlling authority in determining that Taylor's sentencing instruction was constitutionally sound.

Finally, petitioner attempts to portray the *Scott* decision on this issue as *dicta,* claiming that *Mapes v. Coyle,* 171 F.3d 408 (6th Cir.1999), should control. This de-

piction of *Scott* and *Mapes* is inaccurate. In *Scott*, the Sixth Circuit determined that the claim alleging improper jury instructions was procedurally defaulted. It addressed the merits of the claim, however, not, as petitioner suggests, in *dicta*, but "to clarify our precedents governing sentencing-phase instructions on jury unanimity ..." 209 F.3d at 873. Alternatively, the *Scott* court found that its decision was not contrary to *Mapes*, because the court's opinion regarding unanimous jury instructions in *Mapes* was *dicta*. *Id.* at 875. Thus, as *Scott* teaches, the trial court's unanimity instruction was not constitutionally improper.

### e. Reasonable Doubt Instruction

■ Finally, the petitioner challenges the propriety of the trial court's instruction regarding reasonable doubt. In that instruction the trial court stated:

> Reasonable doubt is present when you, the jurors, after you have carefully considered and compared all evidence, cannot say that you are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.
>
> Proof beyond a reasonable doubt is proof of such a character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

Tr. 857–58.

On direct appeal, the Ohio Supreme Court conducted a plain error review of this claim because Taylor failed to object to the instruction during trial and failed to raise it to the Court of Appeals. *State v. Taylor*, 78 Ohio St.3d at 28, 676 N.E.2d 82.

■ The petitioner contends he can demonstrate cause and prejudice to excuse any default based on ineffective assistance of counsel. In this instance, petitioner properly raised an ineffective assistance of counsel claim for failure to object to the reasonable doubt instruction to the Ohio Supreme Court. Thus, the claim is properly exhausted and petitioner may use it to assert cause to excuse his procedural default. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

The analysis does not end, however, with the habeas court's determination that the petitioner has properly exhausted his or her ineffective assistance of counsel claim. To be successful in asserting that ineffective assistance of counsel may constitute cause to excuse procedural default, a habeas petitioner first must demonstrate "that [he] received ineffective assistance of ... counsel that rose to the level of a violation of [his] Sixth Amendment rights." *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir.2000). As is demonstrated in petitioner's first claim for relief, petitioner cannot so demonstrate. Thus, he cannot use ineffective assistance of counsel as cause to excuse the procedural default of this claim.

This claim lacks merit in any event. The instruction the trial court provided to the jury was Ohio's statutory definition of reasonable doubt. Ohio Rev.Code § 2901.05. The Sixth Circuit has ruled that Ohio's statutory definition of reasonable doubt does not offend due process. *Thomas v. Arn*, 704 F.2d 865, 867–69 (6th Cir. 1983). To offend due process, the instruction must be of the type that could mislead the jury into finding no reasonable doubt when in fact there was some. *Id.* at 868; *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In the present case the trial court merely read the statutory jury instruction that has been found constitutional. The instruction cannot be considered misleading.

### 3. Prosecutorial Misconduct

#### a. Inflammatory Remarks During Cross-examination

 The petitioner claims that the prosecutor improperly inflamed the passions of the jury during the cross-examination of defense witness, David Roseborough and the petitioner. After several attempts to elicit from Roseborough his exact location at the time petitioner shot Alexander, the prosecutor became somewhat confused, evoking some apparent laughter from members of the courtroom audience. The prosecutor ostensibly became annoyed by this laughter and commented, "I'll tell you what—they won't be laughing for long." Tr. 685. Defense counsel immediately objected to this comment and the trial court instructed the jury to disregard it. *Id.*

Additionally, when answering the prosecutor's questions on cross-examination, the petitioner repeatedly used the word "sir." The prosecutor took issue with this usage, stating, "And you don't have to keep calling me 'sir.' I'm sure you wouldn't call me that if you saw me in the street." Tr. 775. Finally, in response to the prosecutor's accusation that petitioner and Roseborough "concocted" their testimony, the petitioner stated, "You should be working for Walt Disney, sir. You have quite an imagination—," the prosecutor retorted, "And you should have that bible in your hand when you're out there killing people—." Tr. 782. At the conclusion of both these statements, defense counsel objected, prompting the trial court immediately to instruct the jury to disregard the prosecutor's statements.

Respondent asserts that all of the above claims are procedurally defaulted because the petitioner did not raise them at any juncture in state court. Petitioner counters that, although he did not raise a prosecutorial misconduct claim based on the above-cited prosecutorial comments, he did

raise a prosecutorial misconduct claim to the Ohio Supreme Court. Further, petitioner claims that, so long as he "fairly presented" a claim to state court, he has satisfied the exhaustion requirement pursuant to *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

While petitioner's assertion is not invalid, he fails to acknowledge a corollary to the exhaustion requirement—"that the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented to federal court." *Wong v. Money,* 142 F.3d 313, 322 (6th Cir.1998); *see also Alley v. Bell,* 307 F.3d 380, 386 (6th Cir.2002) (holding substance of claim must have been presented to state court). Because he cannot demonstrate cause for failing to raise this claim in state court, the above claims are procedurally defaulted.

 These claims lack merit in any event. To successfully assert a prosecutorial misconduct claim in a habeas proceeding it "is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). This question must be answered in light of the totality of the circumstances in the case. *Lundy v. Campbell,* 888 F.2d 467, 473 (6th Cir.1989). The prosecutor's comments must be so egregious as to render the trial fundamentally unfair. *Fussell v. Morris,* 884 F.2d 579 (Table), 1989 WL 100857, at *4 (6th Cir. Sept.1, 1989).

Recently, the Sixth Circuit reaffirmed its prior jurisprudence on prosecutorial misconduct. *Boyle v. Million,* 201 F.3d

711 (6th Cir.2000). The court determined that a district court should first determine whether the challenged statements were, in fact, improper, and if so, to determine whether the comments were "flagrant," thus requiring reversal. *Id.* at 717.

> Flagrancy is determined by an examination of four factors: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of evidence against the accused.

*Id.* (internal quotation marks and citation omitted).

While these statements were indeed improper, they were too isolated to prejudice the defendant. Moreover, because the trial court sustained petitioner's objection to these statements, the jury must be presumed to have disregarded them. *Greer v. Miller,* 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions"); *United States v. Ford,* 872 F.2d 1231, 1239 (6th Cir.1989) (same). Petitioner has not overcome this presumption.

#### b. Guilt Phase Closing Argument

Petitioner alleges that the prosecutor made several improper statements during the guilt phase closing argument. First, petitioner takes issue with the prosecutor's statement that "it is too bad Marion Alexander isn't here. He could give you his version of what happened." Tr. 810. Petitioner also alleges that the prosecution attempted to obtain a guilty verdict based on petitioner's association with Roseborough when he stated,

> Now, his compadrie, Roseborough, is sitting back there in the back, in the middle against the wall. What do you think about him? What did you think about his attitude; his demeanor?
>
> I'm sure each of you saw how he stared me down, and the little scene he made right over here when he got to my chair. He looked at me, and he glared at me. That was supposed to frighten me, and he was just glaring.
>
> How do you think Donny felt, and if they would do that in this courtroom, what do you think they did in that bar?

Tr. 812–13. Additionally, in defense counsel's closing argument, counsel stated that, although the state had introduced evidence that a jacket that Alexander wore when murdered was hole-ridden, the state failed to introduce the jacket itself during trial.

In the state's closing argument, the prosecutor countered that, if defense counsel had wanted, they could have used their subpoena power to introduce it. The trial court sustained defense counsel's objection to this statement. Tr. 850. Petitioner claims that this statement constituted the prosecution's personal knowledge that this un-admitted evidence existed. Finally, petitioner alleges prosecutorial misconduct because the prosecutor commented, in rebuttal to defense counsel's assertion that the victim had consumed alcohol on the night of the murder, that the state did not have the identical opportunity to examine petitioner and determine whether he was under the influence of drugs or alcohol when the murder occurred. The trial court sustained defense counsel's objection to the statement and instructed the jury to disregard it. Tr. 852–53.

Respondent alleges that each of these claims is procedurally barred because the petitioner failed to raise them at any juncture in state court. As discussed above, petitioner cannot overcome these allega-

tions. Thus, they are procedurally defaulted and should not be considered on the merits.

If they could be so considered, the petitioner would not be entitled to relief. First, the comment regarding Alexander's inability to recount his version of events was not improper. Rather, it was a factual statement about which the prosecutor could appropriately comment. While the prosecutor's attempt to impugn the petitioner with the actions of Roseborough was not proper, it was not particularly prejudicial considering that the prosecution alleged that Roseborough acted in conjunction with petitioner. The prosecution's comments on the defense's subpoena power to introduce Alexander's jacket and inability to medically examine the petitioner on the night of the murder also were improper. These comments were isolated, however, and prompted the trial court to sustain defense counsel's objection to them. The presumption that the jury could not disregard these statements has not been overcome.

### c. Mitigation Phase Cross-examination

Petitioner next objects to the prosecutor's cross-examination of Dr. Rita Politzer, petitioner's psychological expert. First, petitioner objects to the prosecution's cross-examination regarding whether he could adjust to prison life. Tr. 912. Next, the prosecution questioned the authenticity of the Roseborough statement that Politzer reviewed. Finally, the prosecution asked Politzer who had sought and paid for her services. Tr. 919. Although the trial court initially overruled defense counsel's objection to this line of questioning, the trial court sustained the objection, interrupting Politzer when she stated, "It was my understanding that the Court had asked [defense counsel] to allow for an expert witness, and that the original expert had not -" Tr. 919–20.

The petitioner also claims prosecutorial misconduct occurred during the state's cross-examination of Robert Doss, petitioner's minister. In response to Doss's statement that he did not believe in the death penalty, the prosecutor questioned whether Doss espoused the portion of the Bible calling for "an eye for an eye." Tr. 934. The prosecution also asked Doss if he thought "it was right for Donny Alexander to be killed" and whether he thought "[Donny] wanted to live." Tr. 935–36. The trial court sustained objections to both statements.

As with the previous prosecutorial misconduct claims, the above claims were never presented to the Ohio courts. Thus, they are procedurally defaulted.

These claims lack merit in any event. In regards to Politzer's cross-examination, the prosecutor's question regarding her certainty of petitioner's adjustment to prison life was not improper. Although the remaining prosecutorial statements—the questioning of the authenticity of the Roseborough statement she examined as well as who had hired Politzer—were improper, they were not "flagrant." They were somewhat isolated and, in the instance in which the prosecutor asked who had hired Politzer, there is no indication that the prosecution meant to elicit a response indicating that here had been another expert on the case.

The prosecution's cross-examination of Doss was not, in whole, improper. After proclaiming his religious beliefs during direct examination, it was not improper for the prosecution to further explore them for inconsistencies, impeaching Doss thereby. Although the prosecution should not have asked Doss whether Alexander should have been killed or wanted to live, when viewed in the context of the entire cross-examination, these statements were not

repetitive, nor did they deny petitioner a fair trial.

### D. Mitigation Phase Closing Argument

▮▮▮▮ Finally, petitioner claims that the prosecutor unfairly prejudiced the mitigation phase of his trial. First, the prosecutor questioned the petitioner's use of selected quotes from the Bible, overlooking the statement "Thou shalt not kill." Tr. 962. The prosecutor also stated that Alexander would have relished the opportunity to tell petitioner not to kill him as petitioner's family requested of the jury during mitigation. Tr. 960. The trial court sustained an objection to this statement. Finally, regarding the jury's duty to weigh the evidence, the prosecutor stated, "One of the mitigating factors alluded to by defense counsel was whether the victim of the offense induced or facilitated what happened. You have to weigh that in relation to the defendant's two prior" Tr. 960–61. The trial court sustained defense counsel's objection to this statement.

Petitioner raised this claim to the Ohio Supreme Court on direct appeal. That court rejected petitioner's claims, stating: "Evidence or comments about crime victims, including the impact of a crime on victims, do not offend the United States or Ohio Constitutions, and did not harm appellant." *State v. Taylor,* 78 Ohio St.3d 15, 28, 676 N.E.2d 82 (1997) (citing *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)) (further citations omitted). The Ohio Supreme Court further found that the prosecutor had not improperly commented on nonstatutory aggravating factors by referring to petitioner's prior murder convictions because "the charged death-penalty specification

alleged appellant had previously been convicted of murder." *Id.* Petitioner cannot demonstrate that the Ohio Supreme Court's opinion was clearly contrary to *Payne v. Tennessee, supra,* (holding Eighth Amendment does not bar,*per se,* prosecutorial comments on victim impact), or any other United States Supreme Court precedent. The petitioner is not entitled to relief on this claim.

### 4. Ineffective Assistance of Appellate Counsel

Petitioner claims that he received ineffective assistance of appellate counsel in the Ohio Supreme Court because counsel failed to raise the issue of the trial court's improper voluntary manslaughter instruction raised, *supra,* in his second claim.

This claim is procedurally defaulted because the petitioner did not raise it in any state court. Petitioner asserts that he can overcome this procedural default with cause and prejudice. Specifically, petitioner alleges that the Ohio Supreme Court's holding in *State v. Buell,* 70 Ohio St.3d 1211, 639 N.E.2d 110 (1994) provides him with cause. In that case, the court held that a criminal defendant's appeal to the Ohio Supreme Court was a second appeal as of right.[6] The *Buell* court then found that " '[t]he right to appointed counsel extends to the *first* appeal as of right, *and no further.*'" *Id.* (quoting *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)) (emphasis in original).

▮▮▮▮ Citing this language, the petitioner claims that it would have been futile to have asserted ineffective assistance of appellate counsel because no Ohio court would have considered it. Futility, howev-

---

**6.** With the elimination of intermediate appellate review, the Ohio Supreme Court has promulgated Rule XI(5), which permits a capital defendant to file a claim of ineffective assistance of appellate counsel in the Ohio Supreme Court. This rule is not applicable to Taylor, however, as it applies only to cases in which the offense was committed on or after January 1, 1995.

er, cannot serve as cause for failing to raise this argument in state court. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). As the *Engle* Court stated:

> [T]he futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial. If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to his claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid.

*Id.* at 130, 102 S.Ct. 1558. Although the petitioner in *Engle* was challenging the need to object to a self-defense instruction during trial, the *Engle* Court's reasoning is equally applicable where, as here, a petitioner claims that he or she need not present a claim of ineffective assistance of appellate counsel on direct appeal in the Ohio Supreme Court to *any* state court because the state courts would have rejected it under *Buell.*

Even if petitioner could establish that *Buell* serves as sufficient cause to excuse him from raising ineffective assistance of appellate counsel for failure to raise the voluntary manslaughter instruction to the Ohio Supreme Court, he could not establish, as he must under *Strickland,* that counsel's failure to preserve this claim for appellate review was prejudicial to him, as is described below in the merit review of this claim.

Regardless of its defaulted status, the petitioner would not have prevailed on this claim. Petitioner asserts that, contrary to the Ohio Supreme Court's opinion in *Buell,* he is entitled to constitutionally effective assistance of counsel to that court on direct appeal. It is not necessary to decide this issue, however, as petitioner cannot establish that he suffered prejudice from appellate counsel's allegedly deficient performance. Because "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052, it is possible to disregard this claim based on the fact that it did not prejudice the petitioner.

As stated in claim two, *supra,* petitioner's claim that the trial court's improper jury instruction prejudiced him is without merit. Because this claim is without merit, counsel's failure to raise the jury instruction issue to the Ohio Supreme Court does not undermine the confidence in the outcome of petitioner's direct appeal. Without establishing prejudice, the petitioner's claim must fail pursuant to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**5. Insufficient Evidence to Prove Prior Calculation and Design**

The petitioner was convicted of aggravated murder, defined in O.R.C. § 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another." The Revised Code distinguishes between aggravated murder and murder, which is to "purposely cause the death of another." O.R.C. § 2903.02(A). Only the element of prior calculation and design distinguishes the two provisions, with each requiring that the homicide occur purposely.

Current § 2903.01(A) replaced the former premeditated murder provision when the General Assembly revised Ohio's Criminal Code in 1973. The legislative history, as found in the Commentary to § 2903.01(A), states:

> The first part of this section restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while dis-

carding the notion that only an instant's prior deliberation is necessary. By judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment. See, *State v. Schaffer*, 113 Ohio App. 125, 177 N.E.2d 534 (ohio App.1960). The section employs the phrase, "prior calculation and design," to indicate *studied care* in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation.

(Emphasis supplied).

The Ohio Supreme Court underscored the importance of the 1973 revision of Ohio's aggravated murder statute in *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978):

The apparent intention of the General Assembly in employing [the] phrase ["prior calculation and design"] was to require *more than the few moments of deliberation* permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill. Thus, *instantaneous deliberation is not sufficient* to constitute "prior calculation and design."

(Emphasis supplied).

The standard for prior calculation and design is higher, and more rigorous than the standard of premeditation which it replaced:

Prior calculation and design sets up a more demanding standard than the old first degree murder standard of "deliberate and premeditated malice." Prior calculation and design requires the accused to have killed purposefully *after*

*devising a plan* or scheme to kill. There must be some kind of studied analysis with its object being the means by which to kill. The kind of *momentary deliberation or instantaneous premeditation* that was the accepted standard under the old statute, ..., *is no longer sufficient or acceptable.*

*State v. Jenkins*, 48 Ohio App.2d 99, 101–02, 355 N.E.2d 825 (1976) (citations and footnotes omitted) (emphasis supplied). *Accord, State v. Robbins*, 58 Ohio St.2d 74, 78, 388 N.E.2d 755 (1979)( "prior 'calculation and design' is a more stringent element than the 'deliberate and premeditated malice' which was required under prior law.").

There is, however, no "bright-line test" that "emphatically distinguishes between the presence or absence" of "prior calculation and design." Yet " 'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' * * * required under prior law." "Instantaneous deliberation is not sufficient * * *." " '[P]rior calculation and design' requires 'a scheme designed to implement the calculated decision to kill.' "

*State v. Coley*, 93 Ohio St.3d 253, 263, 754 N.E.2d 1129 (2001) (citations omitted).

■ On direct review of the petitioner's conviction, the Ohio Supreme Court stated that courts are to look to three primary factors when determining whether prior calculation and design exists in a particular case: 1) whether the victim and accused knew each other and, if so, whether their relationship was strained; 2) whether the accused chose the murder site or weapon before the murder; and 3) whether the killing was a drawn-out act or an "eruption of events." *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997) (citing *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (1976)).

█ The time taken by the defendant to perform the pertinent acts—"more than a few moments of deliberation," *Cotton,* 56 Ohio St.2d at 11, 381 N.E.2d 190is perhaps the element least susceptible of bright-line demarcation. "The length of time the offender takes to ponder the crime beforehand" is, however, not alone a critical factor. *State v. D'Ambrosio,* 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993) (quoting *Cotton,* 56 Ohio St.2d at 11, 381 N.E.2d 190). It is clear, accordingly, that, "a prolonged period of deliberation is unnecessary to meet [the] element" of prior calculation and design. *State v. Quinones,* 1982 WL 5957, *11 (Ohio App. 8 Dist., Cuyahoga County, Oct 14, 1982). The crucial factor is whether there was sufficient time, under all the circumstances, for the accused to plan the killing:

> Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

*Cotton,* 56 Ohio St.2d at 8, 381 N.E.2d 190 (Syllabus ¶ 3).

In view of the understandable lack of a bright line rule governing determinations of whether the proof shows prior calculation and design, Ohio courts have consistently considered various factors in addition to those—the defendant's relationship with the victim, the thought given by the defendant to the means and place of the crime, and the timing of the pertinent events—recited in *Taylor,* 78 Ohio St.3d at 19, 676 N.E.2d 82, when determining whether the defendant engaged in prior calculation and design.

Among these other, frequently considered factors are:

— whether the defendant at any time expressed an intent to kill. *See, e.g., State v. Cassano,* 96 Ohio St.3d 94, 108, 772 N.E.2d 81 (2002) (defendant made several statements regarding harming victim); *State v. Sowell,* 39 Ohio St.3d 322, 333, 530 N.E.2d 1294 (1988) (defendant announced his intention to get his gun and shoot the victim); *State v. Mardis,* 134 Ohio App.3d 6, 19, 729 N.E.2d 1272 (1999) (defendant told victim "he would blow his motherf * * * head off"); *State v. Wages,* 87 Ohio App.3d 780, 791, 623 N.E.2d 193 (1993) (sometime prior to murder, defendant stated he should kill the victim).

— there was a break or interruption in the encounter, giving time for reflection. *See State v. Christian,* No. 79789, 2002 WL 451013, at *3 (Ohio App. Mar.21, 2002) (defendant departed, drove around the block and returned to the scene, taking his gun from the glove compartment); *State v. Morris,* No. 76889, 2000 WL 1299551 (Ohio App. Sept. 14, 2000) (defendant left the scene and returned with weapons); *State v. Camp,* No. 74562, 1999 WL 608811, at *4 (Ohio App. Aug. 12, 1999) (defendant returned to the scene after several hours and shot the victim).

— whether the defendant displayed a weapon from the outset. *State v. Palmer,* 80 Ohio St.3d 543, 568–69, 687 N.E.2d 685 (1997) (after minor traffic accident, defendant exited his vehicle with a loaded, cocked firearm; before each of three shots, defendant had to cock his weapon before firing); *State v. Mardis,* 134 Ohio App.3d 6, 18, 729 N.E.2d 1272 (1999).

— whether the defendant retrieved a weapon during the encounter. *See, e.g., State v. Sowell,* 39 Ohio St.3d at 333, 530 N.E.2d 1294 (defendant announced his intention to get his gun and shoot the victim); *State v. Robbins,* 58 Ohio St.2d

74, 78–79, 388 N.E.2d 755 (1979) (defendant went to his apartment after striking his victim and obtained a weapon); *State v. Richardson*, 103 Ohio App.3d 21, 25, 658 N.E.2d 321 (1995); *State v. Markland*, No.2001CA00356, 2002 WL 31151177, at *5 (Ohio App. Sept. 23, 2002); *State v. Stroud*, No. 74756, 1999 WL 980627, at *11 (Ohio App. Oct. 28, 1999); *State v. Long*, No. 96APA04–511, 1997 WL 52911, at *10 (Ohio App. Feb. 06, 1997).

— the extent to which the defendant pursued the victim. *State v. Claytor*, 61 Ohio St.3d 234, 241, 574 N.E.2d 472 (1991) (defendant pursued wounded victim and shot him in the face); *State v. Freeman*, No. 80720, 2002 WL 2027270, at *3 (Ohio App. Sept. 5, 2002) (defendant followed wounded victim and fired second shot as he lay helpless on the ground); *Norman*, 2000 WL 354743, at *7 (participants in fight fled when defendant drew his weapon; defendant pursued his unarmed victim, wounded him, and returned to where he lay firing fatal shots from pointblank range); *Stroud*, 1999 WL 980627, at *11–12 (after heated discussion, defendant obtained a firearm, chased victim, and reloaded as he lay wounded before him).

— the number of shots fired. *Cotton*, 56 Ohio St.2d at 9, 381 N.E.2d 190 (defendant fired numerous shots); *Norman*, 2000 WL 354743, at *7 (same); *Stroud*, 1999 WL 980627, at *11–12 (defendant reloaded as victim lay wounded before him); *State v. Douglas*, No. 15479, 1992 WL 281346 (Ohio App. Oct. 7, 1992) (defendant and companion called victim to their car and defendant shot him repeatedly); *State v. Moran*, No. 45879, 1983 WL 2712, at *2 (Ohio App. Oct. 27, 1983)(defendant fired at least seven shots).

Ohio courts have, however, held that mere possession of a weapon is not, without more, evidence of prior calculation and design. *State v. Davis*, 8 Ohio App.3d 205, 207, 456 N.E.2d 1256 (1982) ("The mere fact that defendant was carrying a gun on this occasion but was not carrying a gun on some earlier visit to a different bar is not sufficient to demonstrate a prior calculation and design to kill someone at this bar."); *State v. Johnson*, No. 97APA03–315, 1998 WL 226441, at *6 (Ohio App. May 5, 1998)("That defendant had a gun with him . . . . is not, by itself, evidence of prior calculation and design, given the testimony offered by defendant's girlfriend that he 'sort of' frequently carried a weapon"); *State v. Carter*, No. 52969, 1987 WL 19869, at *2 (Ohio App. Nov. 12, 1987).

■ The only direct evidence of prior calculation and design can be found in the testimony of the eyewitnesses. The State called three eyewitnesses: an off-duty barmaid, Darlene Youngblood, the barmaid working that evening, Debra Lymore, and a friend of the victim, Denise Shepard. In addition to the petitioner, the defense called two eyewitnesses: Michael Roseborough and Sandra Paul, who had gone to the bar with the petitioner.

All the witnesses agreed that the shooting occurred very soon after Ms. Paul went to the jukebox to play a record. The victim, who was sitting at a "piano" bar apart from the bar at which the petitioner was sitting, asked Ms. Paul to play a recording. The petitioner objected to this request. Words were exchanged. Ms. Paul returned to her seat. The petitioner said to leave. Ms. Paul got up and headed toward the door. Mr. Roseborough walked to the jukebox, and was behind the victim. The petitioner stood up, started toward, and then turned away from the door toward the victim. Some more words were exchanged. As the victim raised his hands, the petitioner started shooting him.

There is also no dispute that the victim and Ms. Paul had had a prior sexual rela-

tionship, and that the petitioner was aware of that relationship.

The jury rationally could find that the initial shots knocked the victim down, and he tried to crawl away from the petitioner. The petitioner stood over the victim and continued shooting the victim four times in the back as he lay wounded at the petitioner's feet.

The testimony of the eyewitnesses disagreed, however, with regard to what, if anything, preceded the events at the jukebox.

Nothing in the testimony of the State's three eyewitnesses gives any indication of any contact, much less any confrontation, between the petitioner and the victim before Ms. Paul went to the jukebox. According to Ms. Youngblood, the off-duty barmaid, the victim, after coming into the bar, had joined her and Ms. Shepard at one end of the bar. The victim served himself a drink, paid for it, and sat down by himself at the piano bar. He sat there alone, not talking to anyone, Ms. Youngblood estimated, for five to ten minutes (Tr. 474–75) or ten to fifteen minutes or "15 to 20 minutes or more" (Tr. 478) before Ms. Paul approached the jukebox. (Tr. 445). He had not said anything to the petitioner or Ms. Paul before Ms. Paul went to the jukebox. (Tr. 498–99).

Ms. Lymore, the barmaid on duty that evening, testified that when the victim had gotten himself a drink, he had been "pretty close" to the petitioner and Ms. Paul, but they had not talked at that time. (Tr. 522–23, 524). It "was way before anything" (Tr. 524) that the victim had gotten his drink and gone to the piano bar.

The victim's friend, Ms. Shepard, likewise testified that the victim got himself a drink and "just sat down and started drinking his drink" without talking to anyone. (Tr. 532). Ms. Shepard then heard the victim say something to the petitioner, and she headed for the bathroom. (Tr. 533). She was in the bathroom "[m]aybe two to three minutes." (Tr. 534). While there she heard "[n]othing at all." (Id.). When she came out of the bathroom, she saw the victim, shot, lying on the ground.

One of the defense witnesses, David Roseborough, testified that the victim flashed his money and taunted the petitioner. But he testified that the victim had done so after Ms. Paul had headed for the jukebox. (Tr. 664–67). Thus, the state's eyewitnesses and one of the defense witnesses did not testify about any conversation or contact, much less a confrontation, between the petitioner and the victim before Ms. Paul went to the jukebox.

Ms. Paul and the petitioner, in contrast, testified that the victim had been boisterous and aggressive before Ms. Paul had gone to the jukebox. According to Ms. Paul, the victim, while standing at the bar, pulled out a large wad of money, which she estimated to be about $2,000, and offered to buy drinks for everybody in the bar. The petitioner, according to Ms. Paul, demurred. (Tr. 701–02). Then the victim sat at the piano bar. Ms. Paul asked the petitioner for a dollar to play the jukebox. When she went to the jukebox, the further verbal exchange ensued, leading to the victim's death.

During the verbal exchange, Ms. Paul testified, the victim said, among other things, "Bitch, didn't I tell you not to bring this mother fucker up here in my bar?" (Tr. 705). Ms. Paul testified that she and the petitioner had previously met the victim at the same bar. On that occasion, Ms. Paul had told the victim that the petitioner was her "man," and he had said he was happy for her. "But," he had also said, according to Ms. Paul, "don't be bringing him in my bar." (Tr. 708).

Ms. Paul testified that she had not told the petitioner about that statement before the shooting. (Tr. 709). She also ac-

knowledged, however, that she had told the police in a post-shooting interview, that the petitioner "didn't much care" for the victim (Tr. 720), whom he had met, she testified, three times before the shooting. (Tr. 718). Ms. Shepard (who herself had been sexually involved with the victim) testified that the day after the shooting she had asked Ms. Paul why the petitioner had shot the victim, and Ms. Paul had said, "Because my man was jealous of Donny [the victim]." (Tr. 795).

Ms. Paul testified that she and the defendant got up to leave. (Tr. 727). Once outside, she heard shots. She had not realized the defendant was not with her as she left the bar. (Tr. 728). She had been outside "maybe a minute" when she first heard the shots. (Tr. 730). As she turned to re-enter the bar, the petitioner was coming out of the bar.

As had Ms. Paul, the petitioner testified that before the jukebox incident the victim had gone behind the bar and taunted him, showing a big roll of money and trying to "belittle" him. (Tr. 751–52). Then the victim went to the piano bar (Tr. 752–53), staring at, but not talking to the petitioner and Ms. Paul. (Tr. 753). In the meantime, the petitioner and Ms. Paul danced, after which he said he wanted to leave. She asked for a dollar for the jukebox (Tr. 755), which led to the further confrontation and shooting.

The petitioner testified that he had earlier seen a pistol in the victim's belt, and that he thought that the victim was drawing his pistol as he was leaving. He claimed he shot the victim in self-defense. No pistol was found; nor was a roll of money found on the victim after the shooting. The jury disbelieved, and rationally could disbelieve, the petitioner's claim of self-defense.

From earlier contacts with the victim before the night of the shooting, the petitioner testified, he thought the victim had a "nasty attitude." (Tr. 743).

In closing argument, the prosecutor stated that the victim had been minding his own business before the jukebox incident. (Tr. 810). Like its three eyewitnesses and the defense witness Roseborough, the State's closing argument did not assert that there had been a precedent encounter, the flashing by the victim of a roll of money, or his taunting of the petitioner. This conformed with the prosecutor's depiction during the State's opening statement that the confrontation originated with the victim's asking Ms. Paul to play a song on the jukebox—"That's what this is all about." (Tr. 398).

Although the State at no time claimed that there had been a prior encounter between the victim and petitioner before Ms. Paul went to the jukebox, and its witnesses testified that there had been no such encounter, the jury could have found, based on the testimony of Ms. Paul and the petitioner, that there had been such an encounter. As discussed below, I conclude, however, that no rational juror could have found beyond a reasonable doubt that any such prior encounter, even if it occurred (as the State manifestly did not believe), evoked prior calculation on the petitioner's part. As also explained below, I conclude that the pertinent time frame for assessing whether the petitioner acted with prior calculation and design began at the jukebox with the victim's request to Ms. Paul to play a record and ended with the shooting.

The eyewitnesses agree that the period between Ms. Paul's approach to the jukebox and the shooting was very brief. The off-duty barmaid, Ms. Youngblood, testified that "it wasn't even a minute" between the petitioner's statement to the victim, "Put your own goddamn dollar in there" and his statement to Ms. Paul, "let's go."

(Tr. 447). When the petitioner said that to Ms. Paul, she was still at the jukebox; she came back to their table and asked to finish her beer. The petitioner said, "Naw.... Let's go," and she grabbed her coat, left her beer, and "went on out the door." (Tr. 448).

Ms. Lymore, the barmaid, testified that after the victim had asked Ms. Paul to play a song, and the petitioner had told him to put his own dollar in the jukebox, the petitioner looked at the victim "[f]or a couple of seconds." (Tr. 508). After "a couple more seconds" Ms. Paul walked back to the petitioner (*id.*), who said to Ms. Paul "that he don't have time for this 'Kid's shit.['] Let's go." [Tr. 509]. She asked to finish her drink, and "He said, 'No,' and he said, 'Let's go,' and she said, 'Okay. Let's go."' [*Id.*].

At that point, Ms. Paul "got up, put her coat on, and headed to the door" with the petitioner and Roseborough "right behind her". But the petitioner "stopped" and said something to the victim, as Roseborough "walked back to the jukebox." [*Id.*]. The victim "stood up, and he said, 'Don't start no shit, and it won't be no shit,' and [the petitioner] said, 'What did you say, mother fucker,' and shot him." [*Id.* 509–10].

Ms. Youngblood had also testified that "I don't even think it was maybe about a minute" between the time Roseborough went to the jukebox and the shooting started. (Tr. 478–79). "The whole thing" according to her, "was about the record." (Tr. 483).

The only other estimate of time found in the record was given by Ms. Shepard, the victim's friend. That estimate related, however, to the time she spent in the bathroom, where she had gone after hearing the victim say something to the petitioner. She testified that she spent "[m]aybe two to three minutes" in the bathroom. (Tr. 534). The shooting had not started before she went to the bathroom. She did not hear any shots while she was in the bathroom. When she came out, the shooting was over and the victim was on the ground.

There is no evidentiary basis for determining rationally when, during the two to three minutes Ms. Shepard was in the bathroom, the shooting occurred. The shots could have been fired immediately after she entered the bathroom or at any time before she came out to find the victim on the ground mortally wounded.

There is no testimonial basis, therefore, for the statement in the Supreme Court's decision that "*most of the evidence*" indicates that the time between the jukebox incident and the shooting was only two or three minutes." 78 Ohio St.3d at 22, 676 N.E.2d 82. (Emphasis supplied). All that the evidence shows is that Ms. Shepard estimated that she was in the bathroom for that period of time, during which the jukebox incident unfolded and the fatal shots were fired, leaving the victim where Ms. Shepard found him when she came out of the bathroom. The "two or three minute" estimate does not, accordingly, relate to the duration of the exchange of words about the jukebox and the firing of the shots. That estimate only tells us how long a witness was gone before she saw the victim on the ground. All that the jury would know from this testimony is that the time between the jukebox incident and the shots was not more than two or three minutes; it could not make any finding about whether it had been that long, or how much shorter it might have been.

The other witnesses—Ms. Youngblood and Ms. Lymore—did not give an estimate of the time between the start of the jukebox incident and the shooting. But they testified that "it wasn't even a minute" between the petitioner's statement to the victim, "Put your own goddamn dollar in

there" and his statement to Ms. Paul, "let's go." (Tr. 447), and that the petitioner looked at victim "[f]or a couple of seconds" (Tr. 508) after he told him to put his own dollar in the jukebox, and for "a couple more seconds" as Ms. Paul walked back to the petitioner (*id.*). At that point, he said, "Let's go," to Ms. Paul, who "got up, put her coat on, and headed to the door" with the petitioner and Roseborough "right behind her". But the petitioner "stopped" and said something to the victim, as Roseborough "walked back to the jukebox"; Ms. Youngblood did not "even think it was maybe about a minute" between the time Roseborough went to the jukebox and the shooting started. (Tr. 478–79). Ms. Paul testified that she had been outside "maybe a minute" when she first heard shots. (Tr. 730).

The state courts rejected the petitioner's contention that there was insufficient evidence of prior calculation and design. The Supreme Court's consideration of this issue began with an endorsement of the evidence as summarized by the Court of Appeals:

> [W]e find that the evidence presented at appellant's trial sufficiently supports the jury's determination of prior calculation and design. The evidence was conflicting as to the events which took place in the bar prior to the shooting. The observations made by the court of appeals as it reviewed the evidence are a reasonable interpretation of the way the jury may have viewed that evidence. The court of appeals dealt with this issue as follows:
>
> > "The evidence reveals Taylor and Alexander did have an exchange of words and intimidating glances prior to the shooting, but the shooting did not occur immediately thereafter. Both men went back to their seats. Taylor ordered his girlfriend to go outside to the car. Meanwhile, his companion, Roseborough, headed for

the door but positioned himself near the door behind where Alexander was seated. When Taylor stood up from his chair to leave, Alexander stood up, put his hands up in the air, and the two men exchanged words again. Taylor immediately pulled out his gun and shot Alexander several times. Alexander fell to the ground and attempted to crawl away, but Taylor walked over to where Alexander had fallen and shot Alexander in the back several times."

> > "It is reasonable to infer that Taylor ordered his girlfriend to leave and waited for Roseborough to strategically position himself behind Alexander because he planned to shoot Alexander. Moreover, Taylor clearly had a choice not to shoot Alexander after Alexander fell down; Alexander was still alive but injured. Taylor made a conscious decision to walk over to where Alexander was crawling face down on the floor and shot him four more times."

> > "Construing this evidence in the light most favorable to the prosecution, there was sufficient evidence to prove the element of prior calculation and design. Taylor's conscious decisions to get his girlfriend out of the way, to strategically position Roseborough, and to continue to shoot Alexander after he was down, more than any other evidence proved he acted with prior calculation and design."

78 Ohio St.3d at 20–21, 676 N.E.2d 82. .

Even though the finding that there had been a prior encounter is a finding of fact under 28 U.S.C. § 2254(d), other evidence in the record shows that the jury could not rationally have found that that encounter resulted in prior calculation and design. That evidence shows that there was an intervening period, which Ms. Youngblood

variously estimated as being at least five minutes to upwards of twenty minutes or more, without any contact, conversation, or confrontation between the petitioner and the victim. Even if there had been an initial incident, in which the victim had flashed a large roll of money and belittled the petitioner, there is no evidentiary basis for believing that that incident, standing alone, gave rise to any homicidal thoughts on petitioner's part, or otherwise would have led to the shooting. The only rational inference that can be drawn from this evidence is that, if there had been no jukebox incident, there would have been no shooting.

Though there was a period in which the petitioner might have reflected and planned, there is no evidentiary basis for concluding that he did so: the shooting can only be viewed as having been provoked by the later events, which occurred only after Ms. Paul went of her own accord to the jukebox to play a record. There is no reason to believe that she did so—or that the petitioner gave her the dollar to do so—to continue or resume a prior dispute with the victim. And there is no reason to believe that the dispute would have been resumed, or the shooting would have occurred, if the confrontation at the jukebox had not arisen.

Prior calculation, if such existed, therefore, could only have been found to have arisen out of the jukebox incident: *i.e.*, the exchange of words about paying for music. Thus, determination of whether the state presented evidence sufficient to enable a rational jury to find prior calculation and design beyond a reasonable doubt must look solely to what happened after Ms. Paul went to the jukebox, and assess whether those events, and the time in which they occurred, suffice to sustain a finding of prior calculation and design.

The Court of Appeals, and the Supreme Court, when it incorporated the appellate court's summary in its opinion, misread, moreover, the record when it stated that the petitioner "ordered" Ms. Paul to "go outside to the car." There is no evidence of any such order; instead, the evidence from all the witnesses is that the petitioner stated that he wanted to leave, or that they were leaving. No witness testified that the petitioner instructed, much less ordered Ms. Paul to leave the bar. Thus, the inference that the petitioner did so to get her out of his way as he set about shooting the victim is not sustainable.

Likewise, there is no evidence to support the Court of Appeals assertion that the petitioner "strategically position[ed] Roseborough" behind the victim as part of a plan to kill him. There is no evidentiary answer to the common sense observation of defense counsel that it would make no sense for Roseborough to get in the likely line of fire. (Tr. 838). The only inference that rationally can be drawn from Roseborough's statement that he wanted to get out of the way (Tr. 669) is that he may have anticipated a fight or something similar between the petitioner and the victim—but not, certainly, that he contemplated that the petitioner would shoot the victim—or, much less, that he was placed in the line of fire by the petitioner as part of a calculated plan to kill the victim.

There is, therefore, no evidence of any "conscious" decisions on the petitioner's part, and any inference that he either ordered Ms. Paul to get out of the way or Roseborough to put himself behind the victim (and in the line of fire) is, absent such evidence, unreasonable. Those putative actions, which the Court of Appeals cited as evidence of prior calculation and design, could not be considered by it, or adopted by the Supreme Court, as manifesting prior calculation and design on the petitioner's part.

The other aspect of the circumstances to which the Court of Appeals looked to support its conclusion about the sufficiency of the evidence of prior calculation and design was the fact that the petitioner "continue[d] to shoot Alexander after he was down." That the petitioner emptied his weapon into the victim's prostrate body is not, however, evidence of *prior* calculation and design. It is, rather, evidence of petitioner's purpose—to kill the victim:

Neither does the evidence that several gunshots were fired prove that appellant formulated a plan to kill [the victim] during the struggle. Although there was evidence [the victim] was injured and calling for help, this does not warrant an inference that the fight was ended and that defendant formulated a plan to kill [him]. This case is distinguishable from cases where witnesses saw the defendant deliberately pursuing or stopping to shoot an injured person, who was trying to crawl away. There is no evidence of what occurred between the victim and the defendant in between the gun shots. Thus, there is no evidence to indicate that appellant formed a plan to kill between the gun shots.

There is no evidence appellant made a scheme or design to kill [the victim], either during the few minutes between the gunshots, or at any other time. There is no evidence appellant engaged in a studied analysis of the means by which to kill.

The facts here show an instantaneous eruption of events; not prior calculation and design. The defendant did not have more than a few moments to formulate a plan to kill. The fight was one continuous course of events and though there was sufficient evidence to show an intent to kill, there was no evidence that such intent was the result of prior calculation and design. To hold there was prior calculation and design in a case such as this would be to return to the old standard of "deliberate and premeditated malice", which was abolished by the legislature.

*State v. Simms*, No. 69314, 1996 WL 532090, at \*3 (Ohio App. Sept. 19, 1996).

Unquestionably, repeatedly firing into the back of a prostrate victim shows an intent to kill. But intent—acting "purposely"—is not the same as acting with prior calculation and design; each is a separate and distinct element of the crime of aggravated murder. *State v. Mardis*, 134 Ohio App.3d 6, 19, 729 N.E.2d 1272 (1999) (" 'prior calculation and design,' " [is] an element entirely independent of and distinct from the less stringent 'purposely,' . .).

The Ohio Supreme Court noted this distinction in *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001), in which it approved jury instructions explaining "how the element of 'prior calculation and design' relates to the element of 'purpose,' " in that " 'prior calculation and design' means that 'the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and means with which to cause the death of another.' " To find prior calculation and design on the basis of the defendant's repeated shooting of the victim conflates the distinct elements of intent and prior calculation and design, and would permit imposition of the death penalty without a showing of an essential element of that offense.

For its part, the Ohio Supreme Court did not rely solely on the summary of the evidence relating to prior calculation and design taken from the Court of Appeals' opinion. The Supreme Court added:

To underscore the observations of the court of appeals, the evidence showed that Sandra Paul had introduced appel-

lant to the victim, Alexander, in the same bar prior to the night of the murder. When Alexander met appellant at that time, Alexander warned Paul not to "be bringing him [appellant] in my bar." Although Paul claimed she told appellant about the warning sometime later, *the jury could have inferred from the circumstances that appellant may have learned earlier of Alexander's statement.* According to appellant, Alexander had a "nasty attitude" and elbowed him when they previously met. Clearly, Alexander and appellant had met before, and their relationship was not a cordial one.

On the night of the shooting, their relationship became more strained even before the jukebox incident. Testimony was conflicting as to Alexander's behavior on the night in question. There was some testimony that Alexander acted like a gentleman that night, but some defense witnesses testified to Alexander's boisterousness. Appellant testified he thought Alexander tried to humiliate him by flashing a big roll of money and saying, "If a nig\* \* \* ain't got no money, he ain't shit." It was also contended by the defense that Alexander "stared" at Paul and appellant when they were dancing earlier that night. Roseborough claimed that Alexander called appellant a "bitch" and a "punk, hip mother fucker," and invited him several times to fight after the jukebox incident. Alexander also purportedly told appellant, "Mother fucker, these are my friends up here \* \* \* [in this bar]. I say and do what I want to do in here." As Paul left the bar, Alexander reportedly told her, "Bitch, I told you not to bring this mother fucker up here to my bar."

The strained relationship between appellant and Alexander occurred because Alexander had previously dated Paul. Furthermore, Alexander had warned Paul not to bring appellant into "his" bar. The night of the shooting, Alexander reportedly was rude and obnoxious, deliberately flashed money in a possible attempt to humiliate appellant, and stared at appellant and Paul as they danced.

*Two other specific factors,* in addition to the previous relationship of the appellant and the victim, allowed the jury to find that appellant engaged in more than "instantaneous deliberation." *Appellant took a gun into a bar where he knew Alexander frequently drank.* The jury could reasonably have inferred that *appellant may have carried the gun with an intention to use it.* The jury could have drawn that inference from all the circumstances surrounding the shooting *even though the prosecution did not specifically claim that appellant went to the bar with the intention of killing Alexander.*

Moreover, *several of appellant's shots were fired after Alexander, already wounded, was lying on the floor.* As Alexander tried to crawl away, appellant walked closer and fired three or four shots into his back. *These circumstances also support the jury's finding of prior calculation and design, since they are inconsistent with an "instantaneous eruption of events."State v. Jenkins,* 48 Ohio App.2d at 102, 2 O.O.3d at 75, 355 N.E.2d at 828.

Even though *most of the evidence indicates that the time between the jukebox incident and the shooting was only two or three minutes,* there was more than sufficient evidence for the jury to reasonably have found that appellant, with prior calculation and design, decided to shoot Alexander in that space of time. "Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves," but "momentary deliberation" is insufficient. Committee

830

Comment to Am.Sub.H.B. No. 511, R.C. 2903.01. In light of the strained relationship between appellant and the victim, and the other factors mentioned above, *two or three minutes is more than instantaneous or momentary under these circumstances,* and is more than sufficient for prior calculation and design.

78 Ohio St.3d at 21–22, 676 N.E.2d 82 (Emphasis supplied).

Much on which the Ohio Supreme Court relied was, however, based on speculation (much of which, in turn, was first advanced by the prosecutor in his closing argument). The Court's statements, when examined in light of the record, even when viewed, as it must be, most favorably to the State, do not fill in the evidentiary gaps on the issue of prior calculation and design.

The Court's statement that "the jury could have inferred from the circumstances that appellant may have learned earlier of Alexander's statement," while accurate (i.e., the jury *could* have made such inference), does not make such inference reasonable, or acceptable as proof of prior calculation and design. The only evidence on the issue of when the petitioner learned about the victim's earlier statement was Ms. Paul's testimony that she told the petitioner about that statement only after the shooting and the petitioner's arrest. There is nothing in the record that would justify an inference that the petitioner was aware of that statement before the shooting, much less that such awareness gave rise to prior calculation and design on his part.

The Supreme Court's further observations about "[t]wo other specific factors" is likewise speculative and unsupported by the record. The Court stated that the "appellant took a gun into a bar where he knew Alexander frequently drank." At most, the petitioner and the victim had met each other three times. There is

nothing in the record to support the Court's contention that the petitioner knew that the victim "frequently drank" at the bar, or, much more importantly, to support the implicit contention that the petitioner anticipated that he and his companions would go to that bar, or that, if they did, they would encounter the victim that evening. The inferential chain is too weak and tenuous to support the Court's conclusion that that circumstance supports a finding of prior calculation and design on the petitioner's part.

The Court also stated that "[t]he jury could reasonably have inferred that appellant may have carried the gun with an intention to use it. The jury could have drawn that inference from all the circumstances surrounding the shooting even though the prosecution did not specifically claim that appellant went to the bar with the intention of killing Alexander."

Mere possession of a firearm by one who, like the petitioner, routinely carried a gun (Tr. 209) is not, however, evidence of prior calculation and design. *State v. Johnson,* No. 97APA03–315,1998 WL 226441, at *6 (Ohio App. May 5, 1998) ("That defendant had a gun with him at the Carter residence is not, by itself, evidence of prior calculation and design, given the testimony offered by defendant's girlfriend that he 'sort of' frequently carried a weapon."); *see also State v. Williams,* No. 1–85–2, 1986 WL 5907, at *2 (Ohio App. May 19, 1986)("The fact that appellant possessed a gun on the day of the shooting when the witness had never before known the appellant to carry a gun, could have been interpreted by the jury as evidence that appellant had acted purposely with prior calculation and design").

The Supreme Court failed, moreover, to consider what was not in the record that other courts have considered in determining whether a defendant acted with prior

calculation and design. The petitioner never uttered an intent to kill; the shooting was not preceded by any threats on his part to do harm to the victim. He did not display or allude to having a firearm. Although there was a break between the initial encounter and the confrontation over the jukebox, nothing in the record suggests that the petitioner contemplated attacking the victim before Ms. Paul went to the jukebox and the victim spoke to her. He, not she or the petitioner initiated the contact at that point. Though the petitioner stood over the victim and shot him as he attempted to crawl away, he had not pursued the victim, or sought him out as he was seeking to escape.

To be sure, the record shows that, the petitioner believed that the victim had a "nasty attitude," the petitioner was dating and the victim had dated the same woman, and they did not care for one another. But this does not show that the petitioner knew prior to going to the bar that the victim considered it to be "his" bar or the victim frequently drank there or that the petitioner had contemplated encountering him, much less doing him harm. Thus, the Supreme Court's inference about the petitioner's intention to use his gun when he entered the bar is without support either in the evidence or inferences that rationally could be drawn from the evidence.

As in *State v. Long*, 96APA04–511, 1997 WL 52911, at *11 (Ohio App. Feb. 6, 1997), the record contains no evidence to suggest that the petitioner anticipated encountering the victim before entering the bar. The court in that case found no prior calculation and design, even though the defendant interrupted the encounter to retrieve a weapon. As in *Long*, the evidence in this case "reveals nothing more than a random meeting between appellant and the victim [and] there is no evidence that appellant gave any thought or preparation to the method and/or site of the homicide."

Similarly, as in *State v. Davis*, 8 Ohio App.3d 205, 207, 456 N.E.2d 1256 (1982), in which the court found insufficient evidence of prior calculation and design, the petitioner had not gone "to the bar with the intent of shooting either of" the victims:

Rather, defendant went to the bar "to have a good time" but was refused admittance. After defendant demanded entrance, verbal threats grew into a physical confrontation between defendant and the three persons within the bar. Defendant did not reach for his gun in his pocket until he was outnumbered and getting the worse of their treatment. No evidence was presented which demonstrated a previous strained relationship between defendant and the doorman or the bar owner. The mere fact that defendant was carrying a gun on this occasion but was not carrying a gun on some earlier visit to a different bar is not sufficient to demonstrate a prior calculation and design to kill someone at this bar.

The shooting occurred during an almost "instantaneous eruption of events."

The circumstances here are similar to those in *State v. Richardson*, 103 Ohio App.3d 21, 25, 658 N.E.2d 321 (1995), in which the defendant, who had been involved in a fight and been beaten, ran to a nearby building, retrieved a gun, shot the victim, and ran away. The court held that the "events were not drawn out but occurred within seconds" and involved " 'almost instantaneous eruption of events,' " rather than a " 'scheme designed to implement the calculated decision to kill.' " To "hold that the conduct here constitutes 'prior calculation and design,' " the court stated, would cause those words "to lose their meaning" and cause "the legislative distinction between murder and aggravated murder [to] disappear." The General Assembly, as is clear from the legislative

history to § 2903.01(A), "intended to impose a harsher penalty upon those who commit murder after reflection, deliberation, or as a result of a scheme or plan." Though "[t]he reflection need not be long, nor the plan elaborate, but it must exist." *Id.; see also Davis*, 8 Ohio App.3d at 207, 456 N.E.2d 1256 (defendant, who "went to the bar 'to have a good time,'" killed victim and shot another individual after being denied admittance to a bar, and was getting the worse of an ensuing fight).

The record in this case shows an almost "instantaneous eruption of events," and that is all that a rational jury could find on the basis of the record, even when viewed most favorably to the State. Even if there were an initial encounter and exchange of hostile words between the petitioner and his victim—though none of the State's witnesses testified about any such encounter—that incident cannot be viewed as generating a decision on the petitioner's part to shoot and kill the victim. At least five, and perhaps as many as twenty or more minutes (according to Ms. Young-blood) elapsed between any such initial encounter and Ms. Paul's going to the jukebox.

After she did so, the events leading to the victim's death unfold rapidly. The evidence of how they unfolded does not suffice to enable a rational jury to find beyond a reasonable doubt that the petitioner acted with the "studied care in planning" required by § 2903.01(A) of the Revised Code. *State v. Jones*, 91 Ohio St.3d at 345, 744 N.E.2d 1163 ("'prior calculation and design' means that 'the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide', which process of reasoning must have included a mental plan involving studied consideration of the method and means with which to cause the death of another"); *see also* Commentary to O.R.C. § 2903.01(A).

By misreading the record to find that "most of the evidence indicates that the time between the jukebox incident and the shooting was only two or three minutes," 78 Ohio St.3d at 22, 676 N.E.2d 82, when, in fact, none of the evidence could sustain a finding that the fatal encounter lasted that long, the Ohio Supreme Court disregarded its own admonition in *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978) that § 2903.01(A) "requires more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill."

The Supreme Court, moreover, misread its prior precedents when it stated:

> The situation in this case resembles previous cases in which this court upheld jury findings of prior calculation and design. *See, e.g., State v. Claytor;* [61 Ohio St.3d 234, 574 N.E.2d 472 (1991)], *State v. Robbins;* [58 Ohio St.2d 74, 388 N.E.2d 755 (1979)], *State v. Toth,* [52 Ohio St.2d 206, 371 N.E.2d 831 (1977)]. In particular, *Toth* involved a defendant who apparently was unacquainted with the victim until the evening of the killing, and a murder which occurred after brief encounters in several bars. The facts in *Toth* are similar to those in this case, and *Toth* did not involve any more evidence of studied deliberation than was present here. This court upheld the jury finding of prior calculation and design and remarked that "[t]he appellant's method of shooting * * * as well as his apparent determination to follow through on a specific course of action, sufficiently supports the finding that the appellant had adopted a plan to kill." *Toth,* 52 Ohio St.2d at 213, 6 O.O.3d at 465, 371 N.E.2d at 836.

78 Ohio St.3d at 22, 676 N.E.2d 82.

In *Claytor* the defendant had been told by a companion not to take a gun with him

when he and the companion went into a Veteran's Administration Hospital. Once in the hospital, the companion told a security officer that the defendant was trouble, and asked for help. After going outside, the defendant and his companion were approached by two security officers, who asked for identification. The defendant gave one of the guards a bank book and a Social Security card. When asked for identification with a picture, the defendant "fumbled through his clothes, then said: 'I will show you something that you don't want to see.'" Drawing a pistol, the defendant twice shot and mortally wounded one of the guards as he sought to back away from the defendant. The defendant then shot the other guard, who, though wounded, tried to flee. The defendant followed him, and after hesitating to clear his gun, which had become jammed, shot him fatally. *State v. Claytor*, 61 Ohio St.3d 234, 235, 574 N.E.2d 472 (1991).

In *Robbins:*

the appellant accosted the decedent in the hallway of their apartment building and struck the decedent, knocking him to the floor. Further, the state's evidence was that the appellant went into his adjacent apartment and got a long knife, or "sword," from under his mattress, returned to the hallway and stabbed the victim to death. The victim tested .42 percent blood alcohol content, which, according to the medical examiner, would probably result in a condition where the victim could not have been a real threat to anyone and that his stupor would have been obvious. The appellant and Hastine Clark, who testified for the prosecution, moved the victim's body to another apartment and attempted to clean the hallway.

The actions of appellant as adduced by the state's evidence established that appellant used extreme aggression against a helpless victim, then leaving the victim in the hallway and returning to his apartment to secure the weapon which he used to stab the victim to death instants later.

*State v. Robbins,* 58 Ohio St.2d 74, 78–79, 388 N.E.2d 755 (1979).

In *Toth*, which the Supreme Court described as not involving "any more evidence of studied deliberation than was present here," 78 Ohio St.3d 15, three young women had gone to a bar around 10:00 p.m.

Upon entering the bar, Patricia left the group to go to the restroom, and upon rejoining her friends, saw the appellant sitting at the bar next to Terri. The girls left the bar around 10:30 p. m. because the appellant was bothering Terri.

The girls then set out by car to the Rock Palace, located about one mile away from the Toy Box Bar, only to again encounter the appellant. While Kathy and Patricia were standing near the juke box, the defendant was seen approaching Terri, who continued to ignore him. The girls thereupon left the Rock Palace and returned to the Toy Box Bar. They arrived there around 1:00 a. m. on the morning of June 5, 1975.

Meanwhile, shortly before 1:00 a. m. that same morning, Orin G. Noyes saw the appellant trying to repair his car on the corner of the parking lot next to the Rock Palace and the main road. Noyes, in assisting the appellant, found that the car's headlights were connected to the wrong terminals, and repaired them. Noyes heard the appellant say that he would "waste" those responsible for "messing" with his headlights.

The appellant then returned to the Toy Box Bar and began to argue with the three girls concerning his headlights. Patricia denied that the girls did anything to his car, and asked that the appellant leave them alone.

Shortly thereafter, the appellant reached into his pants and pulled out a gun. The gun fell to the floor. The appellant picked up the gun, fired and missed. He then grabbed Patricia by the hair, held the gun to her jaw, and fired. Taking two more steps he shot Terri, and from two to four more steps shot Kathy.

*State v. Toth*, 52 Ohio St.2d 206, 207, 371 N.E.2d 831 (1977).

Contrary to the Supreme Court's assertion on direct review of petitioner's conviction, each of the three cases which it described as similar to the petitioner's case with regard to the evidence of prior calculation and design is not at all similar. Each involved substantially more aggressive behavior: in *Claytor*, the defendant, after stating that he would show the victims something they would not like, shot one victim, shot and pursued a second victim, and shot the second victim again after pausing to unjam his gun. In *Robbins* the defendant used "extreme aggression against a helpless victim, then [left] the victim in the hallway and return[ed] to his apartment to secure the weapon which he used to stab the victim to death instants later."

In *Toth*, the facts of which, according to the Ohio Supreme Court on direct review of petitioner's conviction, were similar to those in this case, and "did not involve any more evidence of studied deliberation than was present" in this case, 78 Ohio St.3d at 22, 676 N.E.2d 82, the defendant sought out his three victims over a period of three hours, stated he was going to "waste" them (believing them to have tampered with his car), and shot them seriatim.

The rapid sequence of events in this case neither involved aggressive or threatening statements, pursuit, retrieval of a weapon, or multiple victims. There is, moreover, no basis for the Supreme Court's contention that the scenario in *Toth*, which lasted several hours, repeated and unfriendly encounters between the defendant and his victims, and included his threat to "waste" the victims, "did not involve any more evidence of studied deliberation than was present here." The cases cited by the Ohio Supreme Court as supportive of its affirmance of the petitioner's conviction, on examination, support, as do other Ohio Supreme Court decisions on prior calculation and design, my conclusion that no rational trier of fact could find that the State proved prior calculation and design beyond a reasonable doubt.

I conclude, accordingly, that the petitioner is entitled to relief on his claim that the evidence was insufficient to enable a rational trier of fact to find him guilty beyond a reasonable doubt of aggravated murder.

## 6. Absence During Critical Phase of Trial

During petitioner's trial, there were four instances in which the petitioner and or counsel were not present. First, petitioner was not present when the trial court excused several members of the venire. Petitioner also objects to two instances in which the trial court addressed the jury after deliberations began at both phases. Finally, the prosecution appeared before another judge of the Ohio Common Pleas Court to obtain a *nunc pro tunc* corrected entry of petitioner's prior murder conviction without petitioner's or defense counsel's knowledge. Petitioner claims that, because he was not present during these occurrences, he was denied the right to due process and a fair trial.

Petitioner raised these claims to the Ohio Supreme Court, preserving them for merit review.

 A criminal defendant has the right to be present at any proceeding whenever his presence has a relation, rea-

sonably substantial, to the fulness of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.

■ *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105–06, 54 S.Ct. 330, 78 L.Ed. 674 (1934)) (internal quotation marks omitted). If a federal habeas court determines that error occurred and the defendant was excluded from a critical phase of the trial, the court must then determine whether such error was harmless or prejudicial to the defendant. *Rushen v. Spain,* 464 U.S. 114, 119–20, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983).

### a. Excusing Jurors

■ After gathering the venire, the trial court, *in camera,* excluded several venire members from the panel because of time conflicts or medical hardships that would occur if chosen to serve on the jury. Tr. 4–6. Defense counsel were present at the time and waived petitioner's right to be present.

On appeal, the Ohio Supreme Court determined that Taylor's absence from this hearing was not critical to his receiving a fair and just trial. It concluded: "The proceeding was not a 'hearing' at which the judge received evidence. It was no more than the routine noting of excuses from jury duty." *State v. Taylor,* 78 Ohio St.3d at 25, 676 N.E.2d 82. This holding complies with the *Gagnon* Court's determination that a criminal defendant's right to be present during a proceeding extends only to instances that would affect his or her ability to defend against the crime charged.

### b. Guilt Phase Deliberation Questions

■ During the guilt-phase deliberations, the jury sent a question to the trial judge asking whether murder was an aggravated felony. The trial court incorrectly responded yes. It is unclear from the record whether the trial court consulted with counsel before responding to the jury or if counsel objected to petitioner's absence during the trial court's response.

At the outset it is necessary to note that "[t]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right." *Gagnon,* 470 U.S. at 526, 105 S.Ct. 1482 (quoting *Rushen v. Spain,* 464 U.S. 114, 125–26, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983)) (internal quotation marks omitted). On appeal, the Ohio Supreme Court determined that any error occurring from this communication was harmless. *Taylor,* 78 Ohio St.3d at 26, 676 N.E.2d 82.

As stated above, the United States Supreme Court in *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), held that the test for harmless error is whether the error had a "substantial and injurious effect" on the jury's verdict. Thus, a petitioner must establish that the error resulted in "actual prejudice." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (citing *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)); *see also Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.").

Petitioner fails to demonstrate why the Ohio Supreme Court's harmless error

analysis was an unreasonable application of United States Supreme Court precedent. As *Brecht* states, a petitioner must state that some actual harm occurred from the *ex parte* contact. In this case, petitioner relies merely on conjecture.

### c. Penalty Phase Deliberation Questions

■ As the jurors deliberated after the mitigation phase of trial, they asked the trial court to define duress, coercion, and strong provocation, and whether it would be possible to take this definition with them to the hotel at which they were sequestered. The trial court discussed these questions with counsel, who helped formulate a response to the first question. Defense counsel did not object to the trial court's responses and waived defendant's presence during the *in camera* conversation in which the trial court explained the answers it provided to the jury. Tr. 983–84.

Although petitioner properly raised this issue to the Ohio Supreme Court, it did not specifically address it in its opinion. Any error that occurred during this conversation, however, was harmless. The trial court merely provided the jury with the definition of duress, coercion, and strong provocation that defense counsel previously had helped to create. Moreover, the petitioner's presence during this meeting would have contributed nothing to it. *Gagnon,* 470 U.S. at 527, 105 S.Ct. 1482. Thus, any error that occurred from the trial court's contact with the jury in this instance was harmless.

### d. *Nunc Pro Tunc* Entry

■ During trial, the prosecutor appeared before another judge of the Common Pleas Court to obtain a *nunc pro tunc* corrected entry of Taylor's 1974 murder conviction. The prosecution obtained this entry without notice to either petitioner or his counsel. Defense counsel objected to this entry being admitted into evidence,

but the trial court overruled the objection. Tr. 650–56.

On direct appeal, the Ohio Supreme Court cogently analyzed this claim:

In proposition of law III, appellant argues that the trial court erred by issuing the April 23, 1993 *nunc pro tunc* entry as to the 1974 conviction without giving appellant or his counsel notice of the proposed change or an opportunity to be heard. The judge who signed the *nunc pro tunc* entry, Judge Norman A. Fuerst, was not the judge who presided over appellant's 1993 murder trial. At trial in the instant case, the prosecutor did not explain why he secured that April 23, 1993 *nunc pro tunc* entry after trial testimony had begun on April 22, 1993. The prosecutor also did not explain why no notice was given to opposing counsel regarding the intent to secure the entry. When the prosecutor offered the entry into evidence, appellant's counsel objected.

The state argues that appellant was not wrongfully excluded from a crucial hearing because no hearing was held prior to Judge Fuerst's decision to issue the *nunc pro tunc* entry. However, since the 1993 trial had already started, the prosecutor arguably should have given prior notice to opposing counsel before securing the 1993 entry correcting the 1974 judgment entry.

Nevertheless, the prosecutor did not *per se* violate appellant's right to be present at the proceedings to correct the 1974 journal entry.... Judge Fuerst's decision to sign that entry relating to the 1974 conviction was not a critical stage of appellant's 1993 trial, provided appellant had an opportunity to contest the accuracy of the corrected entry during the course of the 1993 trial. The relevant crucial stage of appellant's 1993 trial occurred when the prosecution of-

fered the *nunc pro tunc* entry into evidence at the 1993 trial. Appellant was present at that point in his trial, appellant and his counsel had notice and an opportunity to challenge the corrected entry's admission into evidence, as they did so, albeit unsuccessfully.... Nor can appellant contest the accuracy of the *nunc pro tunc* entry; he admitted his 1974 conviction was for two counts of murder. In these circumstances, any irregularities concerning the *nunc pro tunc* entry did not affect appellant's fundamental rights.

78 Ohio St.3d at 23–24, 676 N.E.2d 82. The Ohio Supreme Court's finding that the critical phase of the 1993 trial was when the prosecution sought admission of the corrected entry was not an unreasonable application of *Gagnon* because it was only at that point that the corrected entry had an impact on the crime for which he was being tried. His presence at that point renders this claim meritless.

### 7. Improper Admission of *Nunc Pro Tunc* Entry

■■■ Petitioner objects to the trial court's admission of the *nunc pro tunc* journal entry of his 1974 murder conviction. This claim is procedurally defaulted because the petitioner did not raise this claim as an admission of evidence claim at any juncture of his state-court appeals. "[T]he doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money,* 142 F.3d 313, 322 (6th Cir.1998).

■■■ This claim lacks merit in any event. Alleged errors in the admission of evidence, standing alone, are not enough to entitle a petitioner to relief under § 2254. As one court stated, "[e]rrors by a state court in the admission of evidence generally are not reviewable by a habeas court 'unless they so perniciously affect the prosecution of a criminal case as to deny the

defendant the fundamental right to a fair trial.'" *Skaggs v. Parker,* 27 F.Supp.2d 952, 985 (W.D.Ky.1998), *rev'd on other grounds,* 230 F.3d 876, 2000 WL 1634212 (2000) (quoting *Kelly v. Withrow,* 25 F.3d 363, 370 (6th Cir.1994)). "To determine whether the admission of certain evidence violated the defendant's constitutional right to a fair trial, the habeas court must first determine whether the evidence is relevant or probative to an issue on which the prosecution bears the burden of proof." *Id.* (citing *Estelle v. McGuire,* 502 U.S. 62, 69–70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). If the court concludes that the evidence was relevant to an essential element of the state's case, its inquiry is over; by definition, there has been no due process violation. *Id.*

In this case, the evidence of petitioner's 1974 murder conviction was relevant to the prior murder specification found in O.R.C. § 2929.04(A)(5). More importantly, there is no dispute that petitioner was convicted of murder in 1974. Although Ohio Governor Rhodes mistakenly referred to petitioner's conviction as "attempted murder" when he commuted petitioner's sentence in 1982, *Taylor,* 78 Ohio St.3d at 24, 676 N.E.2d 82, petitioner does not now allege that he was not, in fact, convicted of murder. The trial court's admission of the *nunc pro tunc* entry did not deny petitioner a fair trial.

### 8. Unconstitutionality of the Death Penalty

■■■ In this claim, the petitioner asserts that Ohio's capital punishment scheme is unconstitutional on its face. None of petitioners allegations are meritorious. In summary fashion, petitioner's allegations are listed, in italics, and thereafter are the reasons they are unpersuasive.

● *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecu-*

*torial discretion to determine whether to seek a capital indictment.* The Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), rejected this argument under a similar death penalty statute, condoning the discretionary system.

● *Ohio's scheme is unconstitutional because it imposes the death penalty in a racially discriminatory manner.* According to *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), a capital defendant cannot evade a death sentence merely by demonstrating the statistical disparity of capital defendants of a particular race. Instead, a capital defendant must prove that the decision-maker in his or her individual case acted with a discriminatory purpose, and that such actions had a discriminatory effect on the proceeding. *Id.* at 292, 107 S.Ct. 1756. Petitioner has made no such showing in his case.

● *The Ohio scheme is unconstitutional because it is underfunded.* Other than bare assertion, petitioner neither demonstrates that Ohio insufficiently funds its capital cases nor explains how this alleged lack of funds is a constitutional violation.

● *The Ohio scheme is unconstitutional because it denies the capital defendant a fair and adequate appellate review.* Once again, beyond petitioner's assertion, he neither provides evidence of this allegation nor alleges a specific constitutional violation.

● *Ohio's scheme is unconstitutional because it requires the jury to find an aggravating factor during the guilt phase of trial.* The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty. In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court held that any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant. Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence. *Id.* at 605, 98 S.Ct. 2954. The Court further refined the statutory limiting requirement in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible. *Id.* at 875, 103 S.Ct. 2733. Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase. *Lowenfeld v. Phelps,* 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

Ohio's death penalty scheme complies with these mandates. First, §§ 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all statutorily enumerated mitigating factors. Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute. Finally, the Ohio death penalty scheme satisfies the *Zant* requirements by demanding the fact finder to find the existence of at least one aggravating circumstance set forth in § 2929.04(A).

● *Ohio's scheme is unconstitutional because it imposes a risk of death on those capital defendants who choose to exercise their right to trial.* In *United States v. Jackson,* 390 U.S. 570, 582, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the Supreme Court determined that a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth

Amendment right to demand a jury trial. In that case, the Court struck down the capital portions of a federal kidnapping statute because it authorized only the jury to impose the death sentence. Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial." *State v. Buell,* 22 Ohio St.3d 124, 138, 489 N.E.2d 795 (1986). Consequently, the Ohio scheme comports with constitutional mandates.

• *Ohio's scheme is unconstitutional because it requires that the pre-sentence report be submitted to the jury once the defendant requests it.* The respondent alleges this claim is procedurally defaulted because petitioner did not raise it in state court.

This claim lacks merit in any event. Although the Fifth Amendment would be violated if a court *orders* a defendant to undergo a psychiatric examination without informing the defendant that his statements can be used against him, and then admits his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, *see Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself. This reasoning is explained in *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987):

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. This statement leads logically to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Id.* (citations omitted).

• *Ohio's scheme provides an inadequate proportionality review.* Proportionality review is not constitutionally required. *Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). *See also McQueen v. Scroggy,* 99 F.3d 1302, 1333–34 (6th Cir.1996) ("There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review."). By statute, however, Ohio requires the appellate courts to engage in a proportionality review. Ohio Rev.Code § 2929.05(A).

Because Ohio law requires appellate courts to engage in proportionality review, the review must be consistent with constitutional requirements. *Kordenbrock v. Scroggy,* 680 F.Supp. 867, 899 (E.D.Ky.1988) (citing *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)). Nonetheless, when the state courts have engaged in a proportionality review, the district court's review is limited. The district court is to examine the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed." *Id.* (citing *Moore v. Balkcom,* 716 F.2d 1511, 1517 (11th Cir.1983)). *See also Spinkellink v. Wainwright,* 578 F.2d 582, 604 (5th Cir.1978) (same). Moreover, the Sixth Circuit in a recent opinion stated that because "proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for com-

parison." *Buell v. Mitchell,* 274 F.3d 337, 369 (6th Cir.2001).

● *Ohio's scheme is unconstitutional because the jury is not permitted to consider the appropriateness of the sentence.* No such constitutional mandate exists. Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

### 9. Cumulative Error

Petitioner alleges that the cumulative errors that occurred during his trial and appeal warrant habeas relief. Respondent alleges this claim is procedurally defaulted because petitioner did not raise this claim under the same theory at any point in state court.

This claim would be without merit in any event. Accumulated errors are not tantamount to reversible error "if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict." *Satterwhite v. Texas,* 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). If error occurred, but without constitutional significance, then the error is deemed harmless and the verdict sound. *Id.* Petitioner's cumulative error claim lacks merit because, for the reasons set forth elsewhere in this Opinion, his individual claims (except his claim of insufficient evidence) lack merit.

### Conclusion

In light of the foregoing review and consideration of each of the petitioner's claims, including his defaulted claims, on its merits, it is

ORDERED THAT the petition for a writ of habeas corpus be, and the same hereby is granted.

So ordered.